838 P.2d 1314

**SOUTHWEST SAVINGS AND LOAN ASSOCIATION, an Arizona corporation, Plaintiff, Counter-defendant-Appellant,**

v.

**SUNAMP SYSTEMS, INC.; Harvey R. McElhanon; Lloyd D. Seese and Donna G. Seese, his wife; Darrel L. Wilson and Sharon E. Wilson, his wife; Lane S. Garrett and Ursula E. Garrett, his wife, Defendants, Counter-claimants-Appellees.**

**No. 1 CA–CV 88–270.**

Court of Appeals of Arizona, Division 1, Department D.

March 26, 1992.

Reconsideration Denied June 1, 1992.

Review Denied Nov. 3, 1992.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, P.A. by Larry L. Smith, Jeffrey H. Verbin, Mark R. Herriot, Phoenix, for plaintiff, counter-de-fendant-appellant.

James M. LaGanke, P.C., Phoenix, for defendants, counter-claimants-appellees.

## OPINION

FIDEL, Judge.

We consider in this case whether the evidence at trial was sufficient to support a jury's conclusion that a lender froze and later terminated its borrower's line of credit in bad faith. Finding the evidence insufficient, we reverse and instruct the trial court to enter judgment in the lender's favor upon remand.

## FACTS

SunAmp Systems, Inc. was founded in June 1983 to manufacture and sell photovoltaic systems, which generate voltage from sunlight. SunAmp established a dealer network and was chosen by Mobil Solar Energy Corporation and Kyocera International, Inc., to distribute their photovoltaic modules. In the spring of 1984, SunAmp sought financing from Southwest Savings and Loan Association to expand its operations.

Pat Richardson, a Southwest vice president and commercial loan officer, met with Lane Garrett, SunAmp's president, and Lloyd Seese, a SunAmp director, to arrange a line of credit. Richardson explained that, as a start-up company unlikely to quickly turn a profit, SunAmp would need to supply personal guarantees from its investors. Garrett and Seese identified Harvey McElhanon as the company's major investor. After reviewing McElhanon's financial statement, which showed a six million dollar net worth, Richardson described him as a "heavy hitter." Although Garrett, Seese, and Darrel Wilson, a SunAmp manager, also agreed to guarantee a portion of the credit line, Richardson indicated that the McElhanon guarantee would be essential to the loan.

In June of 1984, Garrett, acting for SunAmp, executed a loan agreement and revolving credit note, both prepared by Southwest. When Ursula Garrett, SunAmp's secretary-treasurer, delivered these and other loan documents, Richardson looked them over and commented that everything seemed in order. Among the documents was the McElhanon guarantee; although the form included a space for Mrs. McElhanon's signature, it was signed by Harvey McElhanon alone.

Harvey McElhanon had met earlier with Richardson to discuss his guarantee. The participants describe that meeting differently. McElhanon testified that he informed Richardson from the outset that he would not ask his wife to sign. According to McElhanon, Richardson stated, "I don't know if this will fly without your wife's signature," and McElhanon responded that Richardson should not make the loan if that were so. Richardson testified, however, that McElhanon never told her that his wife would not sign the guarantee. She testified that Southwest expected spouses to sign guarantees, that it was against Southwest's policy to accept a guarantee without a spouse's signature, and that she did not think she would have funded the

loan had she known that Mrs. McElhanon would not sign.

Under the loan agreement, Southwest took a security interest in SunAmp's accounts receivable, inventory, equipment, and other fixed assets as collateral for the credit line. Funds were to be advanced based on the value of this collateral, called the "borrowing base," and the agreement set forth a formula for determining its value.[1]

On June 13, 1984, after closing the transaction, Southwest advanced SunAmp $43,000 in cash and issued letters of credit in SunAmp's favor to two of its suppliers, one for $40,000 to Mobil Solar Energy Corp. and the other for $80,000 to Kyocera International. By July 20, 1984, cash advances had risen to $87,012.

On July 20, 1984, Richardson telephoned SunAmp to discuss a problem with the credit line. Ursula Garrett took the following message: "Pat Richardson of Southwest Savings.... Got advice from Lawyer. Harvey [McElhanon's] guarantee not legal because wife didn't sign. Can't adv[ance] any more money till we straighten this out."

Upon discovering the absence of Mrs. McElhanon's signature, Richardson had consulted house counsel and had learned that the assets listed on McElhanon's financial statement were community property that his lone signature could not bind. Consequently, when Lane Garrett returned her call, Richardson explained what she had discovered and told him that she was forced to freeze the credit line. Neither in that phone call nor in a similar call to Seese

did Richardson request updated SunAmp financial statements; nor did she mention that SunAmp had exceeded its borrowing base. Richardson also contacted McElhanon, who refused to seek his wife's signature, stating that if Southwest would not accept his signature alone, he would have nothing more to do with the loan or guarantee. This conversation left Richardson "panicked" about the security of Southwest's loan and concerned for SunAmp's other guarantors, whose exposure would be magnified by an invalid McElhanon guarantee.

Richardson informed her supervisor, Don Dixon, that she could not determine whether SunAmp had sufficient assets to collateralize credit already outstanding on the line. SunAmp had provided no financial information since its statement of March 31, 1984, reflecting its condition before the credit line commenced. The parties' loan agreement required SunAmp to file monthly financial statements no later than thirty days from the end of each preceding month.[2] However, Southwest had approved the loan on June 4 without a financial statement for the month of April and had not specifically requested statements for April or May prior to the crisis of July 20.

Using the March statement, Richardson calculated SunAmp's borrowing base to be $63,679, insufficient under the terms of the agreement to support the $87,000 in cash already advanced and the $120,000 already committed in letters of credit to SunAmp suppliers. Yet on June 13 Southwest had issued the letters of credit and advanced

1. The loan agreement provided:

 4. *Borrowing Base.* Funds may be advanced on 80% of good account receivables, and 50% of inventory, valued at cost. Good account receivables are all of those receivables which are not 90 days or more past due. Additionally, funds may be borrowed based on 25% of the depreciated value of fixed assets as reported in the most recently prepared financial statement. It is the responsibility of the borrower to assure that funds advanced are not in excess of the available borrowing base. If, at any time, the borrowing base is not adequate to support amounts requested, the amount outstanding in excess of the prior

defined borrowing base must be specifically approved by the Association [Southwest].

2. The loan agreement provided:

 8. *Financial Statements.* Borrower will furnish Association, no later than 120 days after the end of its fiscal year, financial statements which accurately reflect Borrower's assets, liabilities and net worth as of the end of the fiscal year and profit and loss statements for the fiscal year in such form and with such certifications as may be reasonably required by Association. Borrower shall also furnish Association monthly financial statements, as previously defined, no later than 30 days after end of prior month.

$43,000 in cash; thus, Southwest had permitted SunAmp to exceed its borrowing base at the loan's start.

From the outset the parties had regarded the McElhanon guarantee as critical to Southwest's extension of a line of credit to SunAmp. Richardson acknowledged at trial, however, that the written loan agreement nowhere expressly required a binding guarantee from the McElhanon marital community. Richardson also acknowledged seeking and finding an alternative contractual basis to freeze the credit line: SunAmp's failure to provide financial statements for April and May.[3] Dixon testified that Richardson told him she would freeze the line in an effort to get Mrs. McElhanon to sign the guarantee.

Within several days after initiating the freeze, Richardson began seeking accurate financial reports from SunAmp to determine whether the company was doing well enough to permit a thaw. Richardson went to SunAmp's offices, reviewed its financial records, and, through August and September, communicated with Garrett weekly about the state of SunAmp's sales and receivables. Although SunAmp provided financial data, Garrett told Richardson it was inaccurate. SunAmp was hampered in providing accurate data because it was undergoing an independent audit and also undertaking an in-house computer conversion. Richardson could not rely on the data she was given.

Richardson met at least once with Garrett and Seese to discuss ways to resolve the credit freeze, and Richardson proposed two such ways in a letter to Seese on August 30. First, she proposed that Southwest loan $300,000 directly to the four guarantors, who would pay off SunAmp's outstanding balance and loan the remainder to SunAmp. "That," she wrote, "would eliminate the need for Mrs. McIlhannon's [sic] signature and would position Harvey to accept his responsibility on the

credit." Alternatively, she proposed, one or more of the guarantors might "provide sufficient collateral to support the loan."

On September 6, 1984, still awaiting financial data, Richardson directed Garrett to charge no more orders to the letter of credit to Kyocera. Then, on September 19 or 20, SunAmp provided a draft of the outside auditor's financial statement reflecting SunAmp's condition as of fiscal year end June 30, 1984. Richardson calculated the borrowing base from this statement as approximately $90,000, higher than in March, but still inadequate to cover cash advances and letter of credit commitments on the credit line. Moreover, the statement fell below projections in two respects. First, when the parties entered their agreement, SunAmp had projected that it would end fiscal 1984 with negative stockholder's equity of $8,523. The statement, however, showed negative equity of $13,733 despite an intervening $50,000 equity contribution by McElhanon. This contribution did not provide new capital; McElhanon exchanged $50,000 in debt for $50,000 in stock. Yet the company's debt-equity ratio, which should have improved, instead had fallen below projection. Second, SunAmp had projected accumulated fiscal year end losses of $283,633. Its actual losses were $338,843, worse by more than 19%.

On September 20, 1984, after receiving the draft financial statement, Richardson wrote the guarantors, cited material deterioration in SunAmp's financial condition, and asked the guarantors to establish an immediate plan to repay the loan.

Shortly after the credit-line freeze, on July 25, 1984, Southwest had advanced SunAmp $1,098.08 in cash to meet an outstanding obligation. Southwest made no further cash advances, but issued two payments on the letters of credit—one of $49,-166 on October 3, 1984, to Kyocera, and one of $40,000 on October 15, 1984, to

---

**3.** The loan agreement provided:

 12. *Condition of Association's Obligations.* All agreements or commitments of Association to make any loan or advance to Borrower are and will be subject to the following terms and conditions:

 (a) Due and punctual performance by Borrower of all of Borrower's agreements with Association.

Mobil Solar. SunAmp continued to pay interest on the credit line until the summer of 1985 and then filed for bankruptcy in September of 1985.

## PROCEDURAL HISTORY

On September 6, 1985, Southwest filed suit against SunAmp and its guarantors for repayment of the loan. SunAmp eventually counterclaimed; although SunAmp sought damages on both tort and contract grounds, the trial court dismissed its tort claims before trial in rulings that have not been appealed. In the surviving contract claim SunAmp maintained that, by freezing the credit line, Southwest breached the implied covenant of good faith and fair dealing and precipitated SunAmp's demise.

After an eight day jury trial, the trial court directed a $215,744.85 verdict in Southwest's favor on its complaint. SunAmp neither objected to nor appeals this ruling. On SunAmp's counterclaim, the trial court denied Southwest's motion for directed verdict and the jury awarded SunAmp $774,141. Offsetting one award against the other, the trial court entered judgment for SunAmp in the amount of $558,396.15 plus interest. Southwest's post-trial motions for judgment notwithstanding the verdict and new trial were denied.

On appeal, we consider only the issue of sufficiency of the evidence. Taking the evidence in a light most favorable to the prevailing party, *Huggins v. Deinhard,* 127 Ariz. 358, 361, 621 P.2d 45, 48 (App.1980), we find it legally insufficient to establish bad faith. We conclude that the trial court erred in denying Southwest's motion for judgment notwithstanding the verdict. As the other issues briefed relate to damages, we need not address them.

## GOOD FAITH

Our supreme court defined the covenant of good faith in *Rawlings v. Apodaca,* 151 Ariz. 149, 153–54, 726 P.2d 565, 569–70 (1986):

> The law implies a covenant of good faith and fair dealing in every contract. The duty arises by virtue of a contractual relationship. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship.

(Citations omitted.) Although tort damages may be sought where there exists a special relationship between the parties, "the remedy for breach of this implied covenant is ordinarily by action on the contract." *Burkons v. Ticor Title Ins. Co.,* 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991). As a result of trial court rulings that have not been appealed, SunAmp went to trial on contract grounds alone.

SunAmp contends that Southwest acted in bad faith at three distinct moments as the parties' loan agreement unraveled: first, on July 20 when Southwest froze the credit line; second, on September 6, when it directed SunAmp to stop using the Kyocera letter of credit; and third, on September 20, when it terminated the line by demanding that the guarantors establish a repayment plan.

### 1. The Credit Freeze

Southwest argues that it exercised expressly reserved contractual powers when it froze the credit line and that, accordingly, the jury had no valid basis to find bad faith. First, Southwest retained authority under paragraph 4 of the loan agreement to approve or disapprove requested amounts that exceeded the defined borrowing base. Second, according to paragraph 8, SunAmp was obliged to furnish monthly financial statements. Although Southwest had initiated the loan in June without insisting on a statement for the month of April, paragraph 9(j) of the agreement provided:

> No consent or waiver by the Association of the terms of this Agreement shall be effective unless in writing.... No waiver of any breach or default of Borrower shall be deemed a waiver of any breach or default thereafter occurring....

Southwest therefore argues that on July 20, when it recognized the invalidity of the McElhanon guarantee, it had express con-

tractual authority to freeze the line pending review of SunAmp's current finances and to forestall further draws that might exceed the borrowing base.

SunAmp responds that the evidence permitted the jury to conclude that these contractual bases were mere pretexts and that Southwest wielded its contractual authority unfairly and in bad faith. SunAmp points out (1) that Southwest approved the loan on June 12 despite the absence of an April financial statement; (2) that Southwest made advances and issued letters of credit on June 12 that cumulatively exceeded SunAmp's borrowing base; (3) that Southwest neither referred to the borrowing base nor requested April or May financial statements on July 20 when it froze the credit line; and (4) that Pat Richardson, by her own acknowledgement, froze the line to secure Mrs. McElhanon's signature on the McElhanon guarantee. From this evidence and from the fact that the loan agreement did not explicitly require a valid McElhanon guarantee, SunAmp argues that Southwest acted not out of concern for current financial data or the borrowing base, but rather for the dishonest and illegitimate purpose of extracting a guarantee that would bind the McElhanon marital community.

### a. Good Faith Covenant v. Express Contract Terms

■ The parties' arguments pose the question whether one who retains express power or discretion under a contract can exercise that power or discretion in such a way as to breach the implied covenant of good faith. Division Two of this court addressed this question in *Villegas v. Transamerica Fin. Serv.*, 147 Ariz. 100, 102, 708 P.2d 781, 783 (App.1985), where a borrower whose payments were delinquent claimed that the lender had acted in bad faith when, threatening foreclosure, the lender extracted a renegotiated loan agree-

ment on terms more advantageous to itself. The court rejected this argument, stating that it had

> no right to remake contracts to comport with some unspecified notion of fairness nor to refuse enforcement on that ground. That parties have been held to a duty of good faith compliance with contract terms does not create a duty to offer particular terms or to forego available contract remedies.

*Id.* at 103, 708 P.2d at 784.

The California Court of Appeal expressed this same notion when it stated, "the duty to act in good faith does not alter the specific obligations of the parties under the contract.... Acts in accord with the terms of one's contract cannot *without more* be equated with bad faith." *Balfour, Guthrie & Co. v. Gourmet Farms*, 108 Cal.App.3d 181, 166 Cal.Rptr. 422, 427–28 (1980) (emphasis added).[4]

Much of the mystery of the law of good faith lies in the *Balfour* phrase "without more." If contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires. Yet contracting parties, hard as they may try, cannot reduce every understanding to a stated term. Instances inevitably arise where one party exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain. See, for example, *Rawlings*, 151 Ariz. at 154, 726 P.2d at 570. The law of good faith, though inexact, attempts a remedy for such abuse. *See* Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 385–86 (1980):

> The good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary

---

**4.** *Accord Price v. Wells Fargo Bank*, 213 Cal. App.3d 465, 261 Cal.Rptr. 735, 742 (1989) (covenant does not impose affirmative duty of moderation in the enforcement of legal rights); *Creeger Brick and Bldg. Supply v. Mid–State Bank and Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151, 154 (1989) (duty of good faith does not

compel a lender to surrender rights under statute or terms of the contract); *Brighton Dev. Corp. v. Barnett Bank*, 513 So.2d 1103, 1104 (Fla.App.1987) (no bad faith in refusing to refund loan commitment fee and to extend time to complete loan documents).

business purposes—reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach.

(Footnotes omitted.) *See also* Restatement (Second) of Contracts § 205 cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . .").

Consistently with these Burton and Restatement formulations, our supreme court has decided in a variety of contexts that a contracting party may exercise a retained contractual power in bad faith. In insurance bad faith cases, for example, the supreme court has determined that an insurance company may act in bad faith by manipulating its power to evaluate and adjust claims in such a way as to defeat the reasonable expectations of its insured. *See, e.g., Rawlings,* 151 Ariz. at 153–57, 726 P.2d at 569–73; *cf. Farmers Ins. Exch. v. Henderson,* 82 Ariz. 335, 338–40, 313 P.2d 404, 407–09 (1957) (insurance company may act in bad faith by refusing to settle litigation against insured). In wrongful termination cases the supreme court has held that an employer-at-will may fire an employee for no cause, but may not exercise this power abusively for bad cause. *See, e.g., Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 385–86, 710 P.2d 1025, 1040–41 (1985).

In this case, therefore, inquiry does not end with recognition that Southwest had contractual authority to freeze, and ultimately terminate, SunAmp's credit line. The question is whether the jury might reasonably have found that Southwest

wrongfully exercised this power "for a reason beyond the risks" that SunAmp assumed in its loan agreement, Burton, *supra,* 147 Ariz. at 386, 710 P.2d at 1041, or for a reason inconsistent with SunAmp's "justified expectations," Restatement, *supra,* § 205 cmt. a.

#### b. *Justified Expectations*

 SunAmp argues essentially that Southwest "conjured up" a contractual pretext to mask a wrongful reason inconsistent with SunAmp's justified expectations. *See* Restatement, *supra,* § 205 cmt. e ("The obligation is violated by dishonest conduct such as conjuring up a pretended dispute. . . . Other types of violation . . . recognized in judicial decisions [include] abuse of a power to determine compliance or to terminate the contract."). The evidence does not support this argument.

We note preliminarily that SunAmp does not argue that Southwest acted out of spite, ill will, or any other non-business purpose. Southwest's purpose in attempting to secure a valid McElhanon guarantee was undisputedly financial and nothing more. Moreover, this purpose was objectively reasonable, a point that SunAmp sidesteps by attempting to isolate a pair of events that are contextually intertwined. First, because Southwest initially accepted a guarantee that Mrs. McElhanon had not signed, SunAmp assumes that Southwest had no basis for legitimate concern when it later discovered that the McElhanon guarantee was hollow and that Mr. McElhanon's signature alone was ineffective to bind the impressive assets that his financial statement had revealed.[5] Second, because Southwest initially extended credit beyond the borrowing base, SunAmp assumes that Southwest's later attention to the borrow-

---

5. Harvey McElhanon testified that he told Pat Richardson before the loan that his wife would not sign the guarantee. Yet SunAmp does not argue that Southwest deliberately approved the loan agreement without a valid McElhanon guarantee. Nor does the record reasonably support that inference. The McElhanon guarantee agreement was prepared for, though not returned with, both signatures. Garrett and Seese both testified unequivocally that they knew the McElhanon guarantee was indispensable to the loan. Richardson may have overlooked the missing signature; she may have misunderstood the legal importance of the missing signature. The record reasonably permits either inference, but not the inference that Richardson approved the loan recognizing that McElhanon had signed and returned an ineffective guarantee.

ing base was a sham.[6] What SunAmp ignores throughout its argument is the interrelationship between Southwest's initial extension of credit and its mistaken assumption that valid guarantees were all in place.

The evidence shows that Southwest made initial advances and commitments beyond the borrowing base to permit SunAmp to acquire inventory that would enhance its sales and expand its borrowing base. SunAmp's principals knew, however, that these commitments, and the loan itself, were wholly dependent on the guarantees, McElhanon's foremost among them. Lane Garrett testified, in response to questions by SunAmp's counsel:

A. ... Guarantees were essential to the loan. The company couldn't stand on its own.

Q. What person from Southwest Savings told you that?

A. That was Pat.

Q. Was there any one guarantee that was more significant to Miss Richardson than another that she made you aware of?

A. Well, several times I was made aware of it by stating that Harvey was the heavy hitter. She was looking to him. He had the financial statement.

....

Q. ... Did Miss Richardson tell you that there would be no loan without Harvey's guarantee?

A. Yes.

Lloyd Seese likewise testified in response to questions by SunAmp's counsel:

The key discussion that I had [with Pat Richardson] was that the company could not sustain a loan on its own. And that Southwest Savings would not loan money to the company without the guarantee of Harvey McElhanon.

Although SunAmp elicited this testimony, SunAmp discounts its significance because the black letter text of the loan agreement did not require the McElhanon guarantee or any other guarantee to be in place. However, our supreme court has warned that in determining contract rights, courts are not constrained by textual omissions to abandon common sense and experience or to ignore the surrounding circumstances of an agreement. *Burkons v. Ticor Title Ins. Co.*, 168 Ariz. 345, 350–51, 813 P.2d 710, 715–16 (1991) (citing *Smith v. Melson, Inc.*, 135 Ariz. 119, 122, 659 P.2d 1264, 1267 (1983); 3 Arthur L. Corbin, Contracts § 535, at 19–20 (1960)). We would indeed abandon common sense and ignore surrounding circumstances to pretend that Southwest's laxity or firmness in asserting the borrowing base requirement was unrelated to its confidence in the security provided by SunAmp's guarantors.

Had Southwest learned, for example, that a major guarantor had gone bankrupt, the loan agreement's silence on that subject would not have barred the bank from reevaluating the security of its position with particular attention to the adequacy of SunAmp's collateral or "borrowing base." Here instead Southwest learned that McElhanon's guarantee was ineffective to bind his assets. The impact was the same.

By freezing the line, Southwest bought time to seek an effective McElhanon guarantee or assess the security of its position if that guarantee were not forthcoming. It exercised a power that it had preserved at contract formation: to withhold financing pending proof of adequate security. This

---

**6.** SunAmp's argument is actually twofold. First, it argues that SunAmp never in fact exceeded the borrowing base, because the floating loan amount to be covered by the borrowing base included only cash advances, not letter of credit commitments. This argument is patently wrong. Southwest issued *irrevocable* letters of credit to Kyocera and Mobil Solar. These letters authorized the recipients to draw upon Southwest at any time, on SunAmp's account, for funds up to their stated limits. Expert witnesses analogized them to cashiers checks. Because the bank could not exercise discretion to withhold draws on these letters of credit, as it could over requests for cash advances, the letter of credit commitments were included in the overall amount that the borrowing base was required to cover.

SunAmp argues in the alternative that, if the borrowing base was meant to include both advances and letter of credit commitments, it was exceeded from the outset and not a true consideration at the time of the freeze. We respond to this argument in the text.

power, essential in commercial banking, was in street terms to make sure that it was not throwing bad money after good. SunAmp had no justifiable expectation that a reasonable lender would act differently.

### c. Failure to Give Notice

■ SunAmp argues, however, that even if Southwest was not motivated by a wrongful purpose when it froze the credit line, it acted in bad faith by initiating the freeze without prior notice. SunAmp relies on *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), which holds that, under certain circumstances, a lender must give notice and a reasonable chance to seek alternative financing before declining an advance on an established line of credit.

There K.M.C., a grocery wholesaler and retailer, obtained a $3.5 million line of credit secured by all of its accounts receivable and inventory. As further security K.M.C. agreed to deposit all of its receipts in a blocked account to which the lender had sole access. *Id.* at 759. Approximately three years into their agreement, and without prior notice, Irving Trust dishonored a request for an $800,000 advance that would have taken K.M.C.'s balance near the $3.5 million limit. *Id.* at 754. Although Irving relented three days later, by then outstanding checks had been dishonored and K.M.C. collapsed. *Id.* at 754, 762–63. A jury awarded K.M.C. substantial damages for breach of the implied covenant of good faith.

On appeal, Irving emphasized its explicit contractual discretion to make or decline advances; it also argued that an implied notice requirement would conflict with the contract's provision that all monies loaned were repayable on demand. *Id.* at 759. The court responded that, because Irving had sole control of all of K.M.C.'s receipts, its further discretion to withhold advances without notice "would leave K.M.C.'s continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance." *Id.*

The court found substantial evidence that the bank had exercised this discretion in bad faith. The bank was fully secured, any reasonable banker would have found so, and the loan officer who disapproved the advance knew so. Indeed, on the day he refused the advance, the loan officer acknowledged knowing that the bank was adequately secured and that his decision would destroy K.M.C. *Id.* at 762.

The bank conceded the adequacy of its security but argued that the loan officer was nonetheless reasonably concerned that the $800,000 request would neither cover all of K.M.C.'s outstanding checks nor save the company from collapse. This argument was integral to the notice issue; the court posed the question "whether such a belief in itself would constitute a valid business reason ... to refuse to advance the funds requested ... without prior notice." *Id.* at 763. The court concluded that it would not. An Irving vice president testified that it would violate bank policy and constitute bad faith for a loan officer to refuse to advance funds without notice when he knew the bank was adequately secured. *Id.* at 761. Another banker testified that the duty of good faith required pretermination notice if a loan was well secured. *Id.*[7] The court concluded:

> [G]iven that [Irving's loan officer] knew or should have known that the bank was adequately secured, and that if adequately secured it was Irving's policy that some period of notice would be due before financing was denied, [the loan officer's] action could only be justified if in some way he reasonably believed that it was necessary to protect the bank's interests.

*Id.* at 763.

*K.M.C.* does not hold that a line of credit relationship requires a lender always to

---

7. In this case, Dean Smith, a banking expert, likewise testified that a bank ordinarily should give reasonable notice before terminating a line of credit. Yet Smith, listed by Southwest but called as SunAmp's witness, also testified that when Southwest froze the line, it lacked suffi- cient data to support advancing new money. He concluded, based on his banking experience, that Richardson had acted reasonably in freez- ing SunAmp's credit on July 20 and that he would have probably gone further and terminat- ed the credit arrangement on that date.

give notice before declining an advance within the limit of the line. It holds merely that, *in the absence of a valid business reason,* a lender faces bad faith liability if, by failing to give notice and a reasonable opportunity to secure alternative financing, the lender causes damage that reasonable notice might avert. *Id.* at 763. We need not decide in this case whether to adopt a similar rule.[8] That case is very much a product of its facts, and it suffices to list some very different facts in the case at hand:

There the loan officer dishonored an urgent request. Here, no request had been tendered when Southwest froze SunAmp's line. There the lender knew that it was adequately secured. Here Southwest had discovered that a critical guarantee was hollow and that it might not be adequately secured. There the lender knew that its act would precipitate the borrower's collapse. Here no peril was imminent; the freeze merely allowed Southwest to examine its security, examine SunAmp's finances, and determine whether an adequate mix of collateral and guarantees could be found to preserve the line. Here, in short, the freeze itself served as a form of notice: "Can't advance any more money till we straighten this out." And, as we have already concluded, Southwest acted for a valid business purpose as a matter of law.

### 2. Freezing the Kyocera Letter of Credit

■ On September 6, 1984, Richardson wrote to Garrett:

This letter is to confirm our telephone conversation in which we agreed that you would not charge any more orders to Kyocera. You will pay cash on delivery for any orders so that the amount outstanding at Kyocera does not increase. Also, if you do receive the additional

$25,000.00 contribution from your most recent investor, you will reduce the amount outstanding to Kyocera by paying the last two invoices.

SunAmp claims that with this letter Southwest breached the covenant of good faith by terminating charges on the Kyocera letter of credit without substantial justification. We disagree. As of September 6, despite seven weeks of effort, Southwest had neither secured reliable financial data nor resolved the impasse over the McElhanon guarantee. It had no better reason on September 6 than on July 20 to believe that its loan was adequately secured. Just as Southwest acted reasonably to protect the security of its loan when it froze the line of credit on the earlier date, it acted reasonably on the later date by explicitly precluding further charges on the Kyocera letter of credit. There is no reasonable basis in the evidence to find otherwise.

### 3. Termination

■ SunAmp last alleges that Southwest acted in bad faith when Richardson demanded on September 20, 1984, that the guarantors immediately establish a plan to repay the loan. On that day or the day before, Richardson finally received a draft copy of audited June 30, 1984, financial statements prepared by Arthur Young. She then wrote to the guarantors:

After reviewing [the draft financial statements], it is evident that as of June 30, 1984, the financial condition of Sun-Amp Systems, Inc. had deteriorated materially between March 31, 1984 (date of statements used for reviewing loan request) and June 30, 1984. As a result of that deterioration, it is necessary for Southwest Savings and Loan Association to immediately secure its position relative to the loan outstanding to SunAmp Systems, Inc. The company did not have

---

**8.** The *K.M.C.* decision speaks almost interchangeably of termination without prior notice and denial of an advance without prior notice. The court perhaps glossed over the distinction because there, by denying an advance, the lender precipitated the borrower's demise and effectively terminated the loan. One authority, however, has criticized the court's suggestion that a

lender, though sufficiently concerned to warn that future advances are in doubt, must nonetheless continue financing for a time. *See* Steven L. Hilfinger, Note, *K.M.C. Co. v. Irving Trust Co.: Discretionary Financing and the Implied Duty of Good Faith,* 81 Nw.U.L.Rev. 539, 559 (1987).

the available assets at that date to adequately support the debt as required by the Loan Agreement.

At the time of the original loan, the institution relied on the financial capability of the guarantors. It is now necessary to require that those guarantors establish an immediate repayment plan for the loan.

I will meet with you and the other guarantors at your convenience, but a repayment plan satisfactory to Southwest Savings and Loan Association must be negotiated before October 2, 1984 or it will be necessary to start legal proceedings.

Southwest did not actually file suit until September 6, 1985, when SunAmp went bankrupt. In fact, during the last quarter of 1984, Southwest paid approximately $89,000 in outstanding charges on the Kyocera and Mobil Solar letters of credit, and Richardson continued to work with SunAmp to try to resolve its credit problem. We consider, however, whether there is evidence to support the conclusion that Southwest acted wrongfully and for a reason inconsistent with SunAmp's justified expectations when on September 20, 1984, Southwest directed the guarantors to make arrangements to repay the loan.

We need not belabor points already made. SunAmp's fiscal year end losses had exceeded earlier projections by more than 19%, and its equity/debt ratio was more negative than projected, despite McElhanon's equitable contribution of a former $50,000 debt. SunAmp puts a brave face on the numbers and argues that they were not significantly worse than the parties had expected when the loan was made. Even assuming this to be so, SunAmp overlooks again that Southwest's initial credit commitment was undisputedly dependent on the security provided by SunAmp's guarantors. As of September 20, SunAmp's condition appeared at least somewhat worse than projected, and Southwest could not rely on the McElhanon guarantee to secure its loan. Southwest had made an undersecured loan to a struggling company; for two months it had worked with the company seeking ways to enhance its security and save the loan; these efforts had failed; Southwest had contractual power to terminate the loan; it was commercially reasonable to use that power; and under the circumstances SunAmp had no justifiable expectation that Southwest would refrain.

## CONCLUSION

The evidence does not support the conclusion that Southwest breached the implied covenant of good faith and fair dealing. We affirm that portion of the judgment of the trial court that awarded Southwest damages on its complaint, but reverse that portion that awarded SunAmp damages on its counterclaim. On remand the trial court is directed to enter judgment favorable to Southwest notwithstanding the verdict on the counterclaim.

We are unable to determine from the record whether the trial court awarded SunAmp attorneys' fees and costs. Southwest has requested fees for this appeal. Because this matter arises out of contract and Southwest has prevailed, it is entitled to reasonable attorneys' fees in both courts. Ariz.Rev.Stat.Ann. § 12–341.01(A) (1982); *Adams Realty Corp. v. Realty Center Inv.*, 149 Ariz. 405, 409, 719 P.2d 291, 295 (App.1986). We therefore set aside the trial court's award of fees to SunAmp, if any, and remand for a determination of Southwest's fees and costs at trial. Southwest is awarded appellate fees and costs in an amount to be determined upon submission of an application that complies with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

Reversed and remanded.

BROOKS, P.J., and TAYLOR, J., concur.