88 P.3d 169

**WATERFALL, ECONOMIDIS, CALD-WELL, HANSHAW & VILLAMA-NA, P.C., Plaintiff/Appellee,**

v.

**PIMA COUNTY, Arizona, Defendant/Appellant.**

No. 2 CA–CV 2003–0069.

Court of Appeals of Arizona, Division 2, Department B.

April 8, 2004.

Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., By Gerald Maltz and Traci L. Riccitello, Tucson, for Plaintiff/Appellee.

Slutes, Sakrison & Hill, P.C., By Tom Slutes and Diana L. Kanon, Tucson, for Defendant/Appellant.

## OPINION

ECKERSTROM, J.

¶ 1 Defendant/appellant Pima County appeals the trial court's judgment awarding $130,743.60 in attorney fees and costs, plus interest, to the law firm of Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. The trial court found the fees had been incurred pursuant to a contract in which the parties had agreed that the Waterfall firm would provide legal representation for a Pima County prosecutor who had been formally charged with ethical violations by the State Bar of Arizona. The trial court conducted a bench trial and, after taking the matter under advisement, ruled that the County had breached its implied covenant of good faith and fair dealing and that even if that covenant had not been breached, the County had been unjustly enriched and was liable under a theory of *quantum meruit.*

### Factual and Procedural Background

¶ 2 In matters arising from a judgment after a bench trial, we accept the trial court's factual findings and will not set them aside unless they are clearly erroneous. Ariz. R. Civ. P. 52(a), 16 A.R.S., Pt. 1; *Valley Med. Specialists v. Farber,* 194 Ariz. 363, ¶ 9, 982 P.2d 1277, ¶ 9 (1999). In early May 2000, Pima County Attorney Barbara LaWall contacted James Stuehringer, an attorney at the Waterfall firm, and asked him to defend her

employee, then Deputy County Attorney Ken Peasley, against the state bar's formal charges, assuring Stuehringer that Pima County would pay him for the representation. Stuehringer, who had represented Peasley *pro bono* prior to the filing of the state bar complaint, discussed the matter with the chief civil deputy county attorney, and they agreed upon an hourly rate of $125. Stuehringer began work on the formal charges on May 11, 2000, and a few days later, sent a letter to the county attorney's office confirming the arrangement "in light of [the county attorney's] decision that Pima County should pay for [his] representation" of Peasley.

¶ 3 In August 2000, the deputy county attorney sent Stuehringer a letter stating that Pima County would pay "any legal fees you have incurred as of the date of the filing of the State Bar complaint," which was May 11, 2000, but would not pay some $30,000 in attorney fees Stuehringer had accrued previously. Attached to the letter was a document entitled *"CONTRACT FOR LEGAL SERVICES,"* which was a form contract substantially the same as forms used by the County to retain other outside legal services. The contract set a limit of $25,000 on the amount that the County would pay for legal services provided on behalf of Peasley in the absence of further approval by the Pima County Board of Supervisors. The contract also contained a clause providing that the parties had reached no agreements, verbal or otherwise, not found within the contract's express terms. It provided that "notice or correspondence [wa]s to be sent to COUNTY through the Pima County Attorney's Office" in care of the chief civil deputy, whose signature appeared on the contract "approv[ing it] as to Form." The document further stated that the contract "shall not be amended, modified, or altered in any way except by written instrument duly executed by the Parties hereto."

¶ 4 When Stuehringer signed and returned the contract to the chief civil deputy, he included a letter that stated: "By the terms of your letter, Pima County has agreed to pay for any legal fees incurred as of the date of the filing of the state bar complaint, and you should be aware that this date is May 11, 2000." Stuehringer stated he enclosed with his letter, which was dated September 7, the law firm's "bill for services rendered ... from May 11, 2000 through the present ... in the total amount of $15,850.66." On September 15, Pima County Administrator Chuck Huckelberry signed the contract on behalf of Pima County, and in early October, the board of supervisors approved it.

¶ 5 In March 2001, the chief civil deputy sent Stuehringer a letter stating that his firm had "exhausted its monetary limit to this contract and now requires an amendment increasing this amount an additional $25,000.00." She attached to the letter a document proposing two amendments to the contract and asked Stuehringer to "review the attached amendments and if they meet with your approval, sign and return to me as soon as possible." The first proposed amendment added the complaint number issued by the state bar and Peasley's bar number and the second substituted an amount of "$50,000.00" in place of the original amount of $25,000. The document then stated that all other terms of the original contract would "remain in full force and effect" and concluded that the "amendment shall be effective upon execution of document." Both Stuehringer and the chief civil deputy signed the document, leaving blank the spaces for the signature of the chairman of the board of supervisors and the attestation of the clerk of the board.

¶ 6 The board of supervisors considered the proposed amendment at a public hearing on May 22, 2001. After hearing comments from the public, the board unanimously rejected the amendment. The County made no further payment to the law firm beyond the original amount of $25,000 promised by the contract. Nonetheless, Stuehringer continued to provide legal services, eventually incurring $130,743.60 of fees and costs beyond the $25,000 that the County had paid under the contract. Approximately $100,000 of those fees and costs were incurred after the board rejected the amendment.

¶ 7 Both before and after the board voted, Stuehringer had received repeated assurances from the attorneys in the civil division

of the county attorney's office, including the chief civil deputy, (1) that the $25,000 limit was "boilerplate" language, and (2) that Waterfall would be paid in full for its services. During the months following the vote, Stuehringer was also told by the chief civil deputy that if the County could not be persuaded to pay him more than $25,000, the county attorney's office would pay his legal fees out of its own budget. Sometime before September of 2001, the chief civil deputy advised Stuehringer that the county attorney's office had "rethought" its commitment to pay him out of its own budget but assured him that the county general fund would still be required to pay for his legal services due to an indemnification provision in a county ordinance. Stuehringer interpreted these assurances from employees of the county attorney's office to mean that he would be paid as much as the representation cost, even if the total exceeded $25,000. When the County persisted in declining to pay Waterfall for services beyond $25,000, Waterfall filed this complaint.

¶ 8 In January 2003, the trial court conducted a bench trial at which it admitted evidence extrinsic to the contract, including evidence that employees of the county attorney's office repeatedly assured Stuehringer that he would be paid the full amount for his services. After taking the matter under advisement, the trial court found that the County had breached its implied covenant of good faith and fair dealing by refusing to pay Stuehringer any amounts beyond the $25,000 limit specified by the contract. The trial court further found that the contract had never been terminated and continued in full force and effect. The trial court then awarded judgment in favor of Waterfall and against Pima County in the amount of $130,743.60 for Stuehringer's services through December 24, 2002. The court also awarded interest from December 24, 2002.

**Extrinsic Evidence**

■■■ ¶ 9 Pima County first contends the trial court erred in considering extrinsic evidence to interpret the contract. It argues that the court "was mistaken in both finding that there was an ambiguity [in the contract] and finding that [extrinsic] evidence of intent was needed." Our first task, then, is to determine whether the trial court properly considered such evidence. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993) (in interpreting a contract, court must decide whether any evidence other than the contract is admissible).[1] The interpretation of a contract involves questions of law, subject to *de novo* review. *Samaritan Health Sys. v. Superior Court*, 194 Ariz. 284, ¶ 14, 981 P.2d 584, ¶ 14 (App.1998) (contract interpretation is a legal inquiry conducted *de novo*). Although a determination of the intent of contracting parties from extrinsic evidence may require fact finding, the question of "[w]hether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is admissible is a question of law for the court." *Taylor*, 175 Ariz. at 158–59, 854 P.2d at 1145–46.

■■■ ¶ 10 When a contract contains an integration clause—a written expression of the parties' intent that the contract represents the complete and final agreement between them—the parol evidence rule " 'renders inadmissible any evidence of prior or contemporaneous oral understandings and of prior written understandings, which would contradict, vary or add to a written contract.' " *Pinnacle Peak Developers v. TRW Inv. Corp.*, 129 Ariz. 385, 389, 631 P.2d 540, 544 (App.1980), *quoting* Childres and Spitz, *Status in the Law of Contract*, 47 N.Y.U. L.Rev. 1, at 6–7 (1972). The contract be-

1. Waterfall contends the County did not object to the use of parol evidence at trial and, therefore, has waived the issue on appeal. Although the County's own motions only obliquely raised this issue, Waterfall explicitly addressed the admissibility of extrinsic evidence in responding to those motions. In addition, early in the hearing, the County objected to the presentation of extrinsic evidence when Waterfall elicited testimony about a representation the chief deputy county attorney had made to Stuehringer. The County specifically objected on the ground that such testimony was immaterial. Because we conclude the County adequately, albeit inarticulately, raised the issue in the trial court, and because the trial court squarely addressed the issue in its minute entry order, we address it as well.

tween the parties here contained such an integration clause:

**XXIII. *ENTIRE CONTRACT***—It is expressly agreed that this written Contract embodies the entire Contract of the Parties in relation to the subject matter, and that no understanding or agreements verbal or otherwise, in relation thereto, exist between the Parties, except as herein expressly set forth.

Accordingly, the trial court was justified in admitting extrinsic evidence only if the language in the contract was "reasonably susceptible" to the interpretation asserted by Waterfall, the proponent of the evidence, and only insofar as the evidence was not offered to vary or contradict the plain meaning of the agreement. *See Taylor*, 175 Ariz. at 154, 854 P.2d at 1140.

¶ 11 In essence, Waterfall argues that oral representations made by county employees within the county attorney's office caused it to interpret the clause that limited payment to $25,000 as a clause that *guaranteed* payment beyond $25,000 unless the County formally terminated the agreement. However, Waterfall's interpretation of the payment-limitation clause finds little support in the actual language of that clause. That clause reads as follows:

**II. *COMPENSATION AND EXPENSES*—COUNTY** agrees to pay COUNSEL for service under this Contract as follows:

. . . .

**D. *Limit:***  The total amount of fees and costs for professional services rendered under this Contract *shall not* exceed $25,000.00 *unless* additional funding is authorized by County Administrator and approved by the Board of Supervisors.

(Emphasis added.) The provision limiting payment to $25,000 is stated in mandatory language. No part of that clause suggests that either the board of supervisors or the county administrator was required to authorize any additional funding. Instead, the provision expressly limits payment to $25,000 "unless additional funding is authorized by County Administrator and approved by the Board of Supervisors." To conform to Waterfall's interpretation of the contract, we would have to modify the limitation clause to include a provision guaranteeing that if the costs of legal services were to exceed $25,000, the County would authorize further payment. In considering the parol evidence that officers of the county attorney, colleagues of Peasley, gave Stuehringer assurances of virtually unlimited payment for his services, the trial court essentially altered or removed the contract's limitation on payment. Because the clause limiting payment is not itself reasonably susceptible to the interpretation suggested by Waterfall, and because the extrinsic evidence presented by Waterfall to support its interpretation would require us to vary the terms of the contract, the trial court erred in considering extrinsic evidence as to any representations made by county employees regarding the amount of payment.

■ ¶ 12 The integration clause put both parties on notice that they could not rely on any promises or enforce any understanding not found within the four corners of the agreement itself. The County argues persuasively that the enforceability of such clauses is critical for governmental entities, which are often represented by numerous employees who possess varying levels of authority. Those entities depend upon integration clauses to establish the precise boundaries of their contractual obligations and to eliminate any ambiguity as to the identity of the person or body who possesses the authority to bind the entity. Moreover, we do not hesitate to enforce an integration clause when, as here, the party seeking to evade the effect of that clause is a law firm, which presumably possessed more than adequate sophistication to understand the effect of such a clause within a contract. *See Swanson v. Image Bank, Inc.*, 206 Ariz. 264, ¶ 12, 77 P.3d 439, ¶ 12 (2003) (with few limitations, parties of relatively equal bargaining power may determine the terms of their contractual arrangements); *Irwin v. Pac. Am. Life*, 10 Ariz.App. 196, 200–01, 457 P.2d 736, 740–41 (App.1969) (enforcing time limitation based on stipulation against plaintiff where plaintiff's attorneys had expressly agreed to it and "were not innocent, deceived laymen"); *In re Swartz*, 141 Ariz. 266, 273,

686 P.2d 1236, 1243 (1984) ("[B]usiness contracts may be enforced between those in equal bargaining capacities, even though they turn out to be unfair, inequitable or harsh.").

■ ¶ 13 The trial court reasoned that extrinsic evidence should be considered here because there was an ambiguity in the contract created by an inconsistency between the $25,000 limitation and other provisions in the contract suggesting that Waterfall was obligated to continue representing Peasley to the end of litigation.[2] Because the trial court found an ambiguity, it admitted extrinsic evidence "to give effect to the purpose of the engagement of the Waterfall firm, its reasonable expectations, [and] the duty of good faith and fair dealing." See Taylor, 175 Ariz. at 154, 854 P.2d at 1140.

¶ 14 The contract's duration and termination provisions stated:

XV. *TERM*—This Contract shall continue until the conclusion of litigation, until the resolution of the matter, until termination pursuant to paragraph XVI or until a date five (5) years from the date this Contract is entered into, whichever is first. Additionally, the termination date specified herein may be extended upon agreement by the Parties and authorization of the COUNTY.

XVI. *EARLY TERMINATION*—COUNTY shall have the right to terminate this Contract in whole or in part at any time and without penalty or further obligation except as provided in this paragraph. COUNSEL shall be paid at a rate equal to the agreed compensation for requested legal services rendered and reimbursed for authorized expenses actually incurred in rendering such services, up to the date of such termination.

We will interpret a contract "in such a way as to reconcile and give meaning to all of its terms, if reconciliation can be accomplished by way of reasonable interpretation." *Gfeller v. Scottsdale Vista N. Townhomes Ass'n*, 193 Ariz. 52, ¶ 13, 969 P.2d 658, ¶ 13 (App.

1998); *see also Taylor*, 175 Ariz. at 154, 854 P.2d at 1140. While we agree that the contract provided that Waterfall would represent Peasley "until the conclusion of litigation," we do not agree that this fact created any ambiguity as to the amount the County agreed to pay for those services; rather, the contract expressly provided the County would only pay $25,000 unless it agreed otherwise. Nor was the contract ambiguous as to the circumstances under which the County could authorize additional payment; that power was expressly reserved to the board of supervisors. In short, Waterfall's "reasonable expectations" as to the term of its engagement and the terms of its payment were clearly articulated under the contract.

¶ 15 In evaluating the County's duties without using extrinsic evidence, it is clear that the County did not breach the explicit terms of the contract. The County agreed to pay Waterfall $25,000 for the firm's representation of Peasley. The County did so. Under the contract, the County was not obligated to pay more.

### Good Faith and Fair Dealing

■ ¶ 16 The trial court did not find that the County had breached an explicit term of the contract. Rather, it found that the County had breached an implied covenant of good faith and fair dealing by refusing to extend payment beyond the contract's $25,000 limit. In Arizona, there is an implied covenant of good faith and fair dealing in every contract. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, ¶ 59, 38 P.3d 12, ¶ 59 (2002). This covenant prohibits a party from acting in a way that would prevent other parties from receiving the benefits and entitlements of their agreement. *Id.* The obligation of good faith and fair dealing preserves " 'the spirit of the bargain rather than the letter' and guarantees the protection of the parties' reasonable expectations." *Bike Fashion Corp.*

**2.** Arizona law no longer requires a court to find an ambiguity in a contract before considering extrinsic evidence. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993). However, the presence of an ambiguity would suggest that a term of the contract was "reasonably susceptible to the interpretation asserted by its proponent." *Id.* For this reason, we address the trial court's conclusion that such an ambiguity existed.

*v. Kramer,* 202 Ariz. 420, ¶ 13, 46 P.3d 431, ¶ 13 (App.2002), *quoting* 3A Arthur Linton Corbin, *Corbin on Contracts* § 654A at 105 (Lawrence A. Cunningham & Arthur J. Jacobson eds., Supp.1999).

■ ¶ 17 In evaluating whether the County breached this covenant in the instant case, we interpret the contract, and mixed questions of fact and law, *de novo. See Huskie v. Ames Bros. Motor & Supply Co.,* 139 Ariz. 396, 401, 678 P.2d 977, 982 (App. 1984). But whether a party has taken actions outside the "reasonable expectations" of a contract so as to breach the implied covenant of good faith and fair dealing is a factual question. *See Wells Fargo,* 201 Ariz. 474, ¶¶ 67–70, 38 P.3d 12, ¶¶ 67–70. We may reject a trial court's findings of fact only if we find them clearly erroneous. *Huskie,* 139 Ariz. at 401, 678 P.2d at 982.

¶ 18 Here, the trial court's factual findings flowed from its conclusion that the contract's terms as to payment were ambiguous. For this reason, that court placed little weight on the provisions of the contract in assessing the reasonable expectations of the parties as to Waterfall's compensation. As discussed, our *de novo* interpretation of the terms of the contract differs in that we find no ambiguity in its relevant provisions. That conclusion causes us to place much greater emphasis on the contract's express terms in analyzing the reasonable expectations of the parties.[3] Because the trial court erroneously de-emphasized the express terms of the contract in assessing the reasonable expectations of the parties, we find its resulting factual conclusions to be clearly erroneous. *See Valley Med. Specialists,* 194 Ariz. 363, ¶ 9, 982 P.2d 1277, ¶ 9.

¶ 19 The County has argued that its mere exercise of a right expressly retained under the contract cannot be considered a breach of the covenant of good faith and fair dealing. Indeed, Arizona courts have endorsed the view that "[a]cts in accord with the terms of one's contract cannot *without more* be equated with bad faith." *Wells Fargo,* 201 Ariz.

474, ¶ 65, 38 P.3d 12, ¶ 65, *quoting Southwest Sav. v. SunAmp Sys., Inc.,* 172 Ariz. 553, 558, 838 P.2d 1314, 1319 (App.1992), *quoting Balfour, Guthrie & Co. v. Gourmet Farms,* 108 Cal.App.3d 181, 166 Cal.Rptr. 422, 427–28 (1980). Courts have expressed concern that

> "[i]f contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires."

*Wells Fargo,* 201 Ariz. 474, ¶ 66, 38 P.3d 12, ¶ 66, *quoting Southwest Sav.,* 172 Ariz. at 558, 838 P.2d at 1319. Notwithstanding this caveat, our courts have found that a party may breach the implied covenant of good faith and fair dealing *even in the exercise of an express power* under a contract, where one party exercises its discretion under the contract in such a way "as to deny the other party a reasonably expected benefit of the bargain." *Southwest Sav.,* 172 Ariz. at 558, 838 P.2d at 1319.

■ ¶ 20 To harmonize these competing principles, our supreme court has emphasized that the covenant does not prohibit the exercise of discretion under a contract " ' "for any purpose ... reasonably within the contemplation of the parties." ' " *Wells Fargo,* 201 Ariz. 474, ¶ 66, 38 P.3d 12, *quoting Southwest Sav.,* 172 Ariz. at 558–59, 838 P.2d at 1319–20, *quoting* Steven J. Burton, 94 Harv. L.Rev. 369, 385–86 (1980). Accordingly, a contract is breached only if a party has used " ' "its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach." ' " *Id.* Thus, a party can conceivably breach the covenant of good faith and fair dealing by merely exercising a right expressly bestowed by the contract. However, as contracts are designed to memorialize and enforce the intentions of the parties, the express terms of a contract remain the best evidence in assessing the parties reasonable expectations under that contract. *See*

---

3. We do not address the more abstract question of whether the parol evidence rule applies when considering an implied covenant of good faith and fair dealing. Rather, we address the inte-

gration clause because, like any other provision in the contract, that clause is relevant in assessing the reasonable expectations of the parties to that contract. *See infra* at ¶ 25.

*Shanks v. Davey Tree Surgery Co.*, 173 Ariz. 557, 560, 845 P.2d 483, 486 (App.1992) ("The language used by the parties in a contract reflects their intentions and is controlling as to its meaning.").

¶ 21 Using these guidelines, we consider whether the County's refusal to authorize the expenditure of more than $25,000 fell beyond the risks assumed by Waterfall when it entered into the agreement with the County to provide legal services for Peasley. The contract contained a mandatory term stating that payment "shall not" exceed $25,000 unless additional funding was duly authorized by the board of supervisors. As noted, the contract also contained an express term governing amendments by which such authorization must occur:

> XXV. *AMENDMENTS*—This Contract shall not be amended, modified, or altered in any way except by written instrument duly executed by the Parties hereto.

Thus, although the parties clearly intended to leave open the possibility that additional funding could be authorized, the parties expressly provided how that must occur. When we assign the words of this contract their plain and unequivocal meaning, these provisions are subject to only one interpretation—that funding *may* be increased but only if such an increase is approved by the designated authorities. Moreover, the provision that expressly provided the board of supervisors with the discretion to decline further payment was not an obscure or corollary component of the contract. To the contrary, the payment provision set forth the core performance required of the County and is prominently labeled as a limit to the compensation due. When the contract so clearly put Waterfall on notice of the board's right to decline to authorize additional funding, Waterfall cannot plausibly claim that the possibility of such a decision fell outside the reasonable contemplation of the parties. *See Wells Fargo*, 201 Ariz. 474, ¶ 66, 38 P.3d 12, ¶ 66.

¶ 22 Moreover, the parties presented the trial court with no evidence that the board of supervisors voted to decline payment in order to pursue any improper or unforeseeable purpose. Waterfall asserts, with little factual support, that the board declined further funding for political reasons. But the board of supervisors is obviously a political body. For this reason, a decision by that body based on political considerations was foreseeable to Waterfall and, therefore, was within the risks contemplated when Waterfall agreed to a limitation on payment that could only be exceeded with the approval of that body.

¶ 23 The trial court found, without explanation, that the board of supervisors' rejection of the county attorney's advice to authorize additional payments demonstrated the County's lack of good faith. But we find no law or any provision in the contract that requires the board to agree with the legal advice provided by its county attorney on the question of whether to expend public monies for professional services. Certainly, we find nothing in the record that would suggest Waterfall possessed a reasonable expectation, at the time it signed the contract, that the board would always follow the advice of its county attorney when it voted on public expenditures.

¶ 24 Specifically, the county attorney had recommended that the board authorize additional payment because, in its view, Pima County Code § 3.04.140 required that the County indemnify Peasley for his legal expenses. That section provides, in pertinent part, that the County "will defend" any employee of the county against "any and all claims and civil liability for alleged acts" taken "in the course and scope of employment." Pima County Code § 3.04.140(A). But the board's rejection of the county attorney's advice could not itself constitute bad faith if the board reasonably believed that its county attorney had misinterpreted this provision. We find nothing illogical, unreasonable, or unforeseeable in the board's contrary interpretation of that section—that it required indemnification for civil tort claims but not for professional disciplinary proceedings arising against county employees.[4]

---

4. The County notes that Pima County Code § 3.04.140 is found within the "Risk Manage- ment" chapter and that its related sections explicitly limited the County to expenditures that

Moreover, the board's refusal to follow the advice of its own county attorney would only constitute a breach of good faith and fair dealing if Waterfall had developed some reasonable expectation at the time it signed the contract that the board was obligated to follow the county attorney's advice. We find no evidence in the record that Waterfall was even aware of § 3.04.140 at the time it entered the contract, let alone that it had depended on a particular interpretation of it in forming its reasonable expectations as to the board's discretion under the contract.

¶ 25 Waterfall argues that as a result of representations by Peasley's former colleagues in the county attorney's office, the law firm had a reasonable expectation that the board of supervisors would authorize additional funding. But the contract did not give Waterfall the right to form any expectations based upon any verbal assurances or other representations not specified in the contract. To the contrary, the contract placed Waterfall on notice that the statements of county employees could not bind the County as to any amendments. As previously discussed, the contract's integration clause had alerted Waterfall that no "understandings" existed between the parties based on oral or written representations not confirmed by the express terms of the contract. Moreover, section IA of the contract alerted Waterfall that no county official or employee could verbally authorize Waterfall to perform any legal services for the County. Thus, the contract itself precluded Waterfall from forming any reasonable expectation that the board's discretion to deny payment was limited by assurances of further payment from officials in the county attorney's office.

¶ 26 Finally, Waterfall argues that the past practice of the board of supervisors in routinely authorizing payments in excess of $25,000 entitled Waterfall to reasonably expect that the board would similarly authorize additional payments for its professional services. But this evidence, which arguably entitled Waterfall to be optimistic about receiving further payment, did not entitle Waterfall to perceive that it possessed a contract that guaranteed further payment. We cannot assess a party's reasonable expectations as if that party were the only party to the contract. If we were to apply the covenant of good faith and fair dealing in the fashion suggested by Waterfall, we would eviscerate the County's own reasonable expectations under the contract. The County was entitled to reasonably expect that, once Waterfall's billing had reached $25,000, the board of supervisors, as the body elected by the taxpayers to make decisions regarding the use of public funds, would be entitled to exercise its discretion to determine whether additional funding was warranted.

¶ 27 For all of these reasons, we cannot conclude that the County's rejection of funding beyond $25,000 was beyond the contemplation of the parties. See Wells Fargo, 201 Ariz. 474, ¶ 66, 38 P.3d 12, ¶ 66. We thus conclude that the trial court erred in ruling that the County had breached its duty of good faith and fair dealing by refusing to authorize additional funding.

## Unjust Enrichment

¶ 28 The trial court further found that, even if the County had not breached the covenant of good faith and fair dealing, Waterfall would nevertheless be entitled to recover under the equitable doctrine of *quantum meruit* in order to prevent unjust enrichment. We disagree. The Arizona Supreme Court has stated that "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (1976); *see also USLife Title*

were authorized by the enabling statute, A.R.S. § 11-981(2). That enabling statute limits a county to make payments as part of its risk management fund only for "property loss sustained or lawful claim[s] of liability" made against the "county or its officials or employees." *Id.* Under the circumstances, the board of supervisors could have reasonably concluded that a disciplinary action brought by the state bar did

not constitute such a "claim of liability." We need not decide the merits of whether the County possessed a duty under § 3.04.140 to pay for Peasley's legal services because we do not here address an indemnity claim brought by Peasley. Rather, we address whether the County was duty bound to pay Waterfall more than $25,000 for the representation under a theory of contract.

*Co. of Ariz. v. Gutkin,* 152 Ariz. 349, 354, 732 P.2d 579, 584 (App.1987); *Johnson v. Am. Nat'l Ins. Co.,* 126 Ariz. 219, 223, 613 P.2d 1275, 1279 (App.1980). Here, the parties entered into a specific agreement that defined the parameters of the relationship of the parties concerning Waterfall's representation of Peasley. The contract specified the term of the representation—"until the conclusion of litigation"—and described the performance that was required by the County in return for Waterfall's agreement to undertake the representation—payment of $25,000 unless the county administrator and the board of supervisors authorized additional funding. Because the extent of Waterfall's representation and the compensation for that representation were specified in the contract, and because the County completed its performance under the explicit terms of the contract, the doctrine of unjust enrichment has no application here. *See Brooks,* 113 Ariz. at 174, 548 P.2d at 1171.

¶ 29 Waterfall argues, and the trial court concluded, that the presence of a specific contract only bars a claim of unjust enrichment if the claimant would otherwise recover twice for the same performance. Waterfall contends that it seeks no such "double recovery" and thus its claim for unjust enrichment should not be barred by that doctrine. Waterfall's argument is not supported by Arizona law.

¶ 30 During oral argument, Waterfall suggested that *USLife Title* and *Brooks* authorize the remedy of unjust enrichment, notwithstanding the presence of a specific contract defining the relation of the parties, when the claimant is not seeking double recovery. Although *USLife Title* did reject an unjust enrichment claim on the *additional* ground that a successful cause of action would have provided the claimant with double recovery on the facts before it, it also stated without qualification that "the existence of a contract specifically governing the rights and obligations of each party precludes recovery for unjust enrichment." *USLife Title,* 152 Ariz. at 354–55, 732 P.2d at 584–85. Nothing in that case suggests that its discussion of double recovery was intended to limit or qualify the bar to unjust enrichment claims in the presence of an express, enforceable contract.

¶ 31 *Brooks* does not support Waterfall either. There, the supreme court addressed an argument by a mortgagor that it was entitled to a return of the interest the mortgage bank had earned upon amounts collected for impoundments. *Brooks,* 113 Ariz. at 174, 548 P.2d at 1171. Because the mortgagor had not collected the interest on impoundments from any other source, there could be no argument that it had sought double recovery of those proceeds. However, the mortgagor asserted, *inter alia,* that the bank had been unjustly enriched by keeping those interest proceeds for itself. *Id.* Noting that the parties had entered a specific mortgage contract that imposed *no obligation* on the bank to reimburse the mortgagor for interest earned on impoundments, the court concluded that the doctrine of unjust enrichment has no application where there is a specific contract that governs the relationship of the parties. *Id.* Thus, our supreme court applied the express contract bar to the remedy of unjust enrichment even in cases where, as here, the claimant was not seeking double recovery.

¶ 32 Reasonable minds can differ on the question of whether the County should have, as a matter of public policy, agreed to completely fund Peasley's representation in connection with the state bar disciplinary matters[5] and whether Waterfall struck a wise bargain when it agreed to defend Peasley without guarantees of payment beyond $25,000.[6] But, "the quasi-contractual principle of unjust enrichment does not apply to an agreement deliberately entered into by the

---

5. The trial court found that Peasley "was employed as a prosecutor by the County for more than 20 years. He received accolades and awards for his job performance including having been named Prosecutor of the Year on multiple occasions."

6. The trial court found that Stuehringer had received the highest ratings for his legal ability and ethical standards from Martindale–Hubbell Law Directory, that he had substantially reduced his hourly fees in representing Peasley, and that the total cost of Waterfall's services on behalf of Peasley surpassed $150,000.

parties, 'however harsh the provisions of such contracts may seem in the light of subsequent happenings.'" *Johnson,* 126 Ariz. at 223, 613 P.2d at 1279, *quoting Durham Terrace, Inc. v. Hellertown Borough Auth.,* 394 Pa. 623, 148 A.2d 899 (1959). We therefore find that the trial court erred when it concluded that Waterfall was entitled to compensation for all attorney fees and costs incurred on behalf of Peasley under the doctrine of *quantum meruit.*

### Conclusion

¶33 Because the County and Waterfall entered into a valid contract in which Waterfall agreed to represent Peasley until the conclusion of litigation, because the contract expressly limited payment for those services to $25,000 in the absence of authorization by the board of supervisors for additional funding, and because orderly commerce depends on the ability of parties to make contracts that specifically define and limit their obligations, *see Wells Fargo,* 201 Ariz. 474, ¶66, 38 P.3d 12, ¶66, we reverse the trial court's judgment against the County for failing to pay Waterfall beyond the amount agreed upon by contract. Pursuant to A.R.S. § 12-341.01(A), we award the County its reasonable attorney fees and costs on appeal upon compliance with Rule 21(c), Ariz. R. Civ.App. P., 17B A.R.S.

CONCURRING: PHILIP G. ESPINOSA, Chief Judge, and JOSEPH W. HOWARD, Judge.