[Civ. No. 18970. Fourth Dist., Div. One. July 15, 1980.]

BALFOUR, GUTHRIE & COMPANY, LTD., Plaintiff,
Cross-defendant and Respondent, v.
GOURMET FARMS et al., Defendants, Cross-complainants and
Appellants.

**COUNSEL**

Plourd, Blume, Scoville & Strickland and John W. Breeze for Defendants, Cross-complainants and Appellants.

Thompson, Sullivan, McGrath & McDonald, Eric V. Benham and Donald McGrath II for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**STANIFORTH, J.**—Plaintiff Balfour, Guthrie & Company, Ltd.'s (Balfour) suit seeks money damages for breach of written contract for the purchase by Balfour of defendant Gourmet Farms' (Gourmet) entire production of wheat for the 1976 growing year. Gourmet cross-complained seeking money damages for breach of the same contract. After a nonjury trial, the court awarded Balfour $45,375.63 plus costs plus interest and denied Gourmet relief on its cross-complaint.

Gourmet appeals contending: (1) The trial court erred in permitting Balfour's expert witness, Paul Viscetto, to testify over objection to custom and usage within the grain brokerage business in aid of interpretation of disputed provisions of the contract, (2) Balfour breached an implied covenant of good faith in the contract in failing to take action, which if not taken, would and did deprive Gourmet of the fruits of its

contract. Gourmet argues that the buyer, Balfour, should have made, on its own initiative, margin calls and "priced out" the contract, should not have allowed the price of wheat to decline—as it did—before making the margin call and upon Gourmet's failure to respond "pricing out" the contract, and (3) Gourmet contends certain costs were improperly awarded to Balfour.

## FACTS

Balfour is a corporate grain broker. Gourmet is a wheat grower in Imperial Valley. On May 6, 1976, these parties contracted in writing for the sale of approximately 76,000 bushels of wheat to be delivered to Balfour as it was harvested.

The contract "Purchase Order" provides: "#2 HARD RED WINTER WHEAT, A.D.D.

"Production of 1020 Acres, estimated 2,250 Tons Includes 450 Acres Anza Wheat—No discount a/c Yellow Hard.

"$.45 per bu. under the K.C. December 1976, futures contract. Delivered fit, Brawley, Ca. Fix price later.

"May/June 1976 delivery

"$4.80 per cwt. advance on delivery, final settlement when price is fixed. If K.C. December falls to $3.55 per bu. contract is to be priced at that time or seller must maintain margin at $5.16/cwt $3.55-.45 = $3.10 per bu. or $5.16 per cwt. Balfour-Imperial 1.) Price to be fixed during regular trading hours of the K.C. Board of Trade at seller's call up to Dec. 1, 1976. If not priced prior Dec. 1, contract will automatically be priced that date. 2.) In event seller wishes to defer fixing price beyond Dec. 1, 1976, he may elect to switch to the K.C. March 1977 Futures Contract at price spread between the two Futures Contracts on day of exercising this option. 3.) At time of delivery buyer assumes possession, title, and all rights of ownership on grain covered by this contract."

By this contract the price of the wheat was to be set in the future according to the contract specified formula. This delayed pricing feature of the contract creates what is known in the grain brokerage industry as

a "fixed-price-later contract." To eliminate the risk of the price fluctuations inherent in this type of contract, Balfour purchased corresponding wheat futures contracts. By this process of "hedging," Balfour insulated itself from the risk of price fluctuations, thereby establishing the market equivalent of a purchase at a fixed price.

Gourmet, on the other hand, accepted the risk of price fluctuation. As Gourmet partner James Enis testified: "It was my understanding that Balfour-Guthrie was going to hedge the number of contracts that covered the wheat they bought from me on the market. . . .

". . . I really—I was risking some money, but I had a—I had until December first to set the price. The year prior on the contract with Koppel I did not set the price until February of the next year." Asked why he had agreed to a "fixed-price-later contract," Mr. Enis stated: "Well, the market price at the time was—was not as high as we would like to have sold our wheat for. The prior years the market had a tendency to go up in value after our harvest season down here. And through our—through just the history of it, we decided we would go ahead and take a lower price at that time, hoping to get a higher price down—down the road."

The wheat was delivered in June and August of 1976 and Gourmet was given an advance on the purchase price of $218,041.35. This represented 80 percent of the then current market value of the wheat.

Pursuant to the terms of the contract, Balfour had the right to and did demand that Gourmet "make margin" if the market price declined below the specified price. In the context of this contract, "making margin" meant returning a portion of the advanced purchase price to Balfour so the amount of the advance did not exceed 80 percent of the then current market value of the wheat.

Before the November 11, 1976 "pricing out," Balfour had made two margin calls and Gourmet had returned $9,500 and $4,500 of the advanced purchase price. Upon Gourmet's failure to respond to a November 9, 1976, margin call, Balfour "priced out"—fixed the contract price of the wheat. By that date (Nov. 11, 1976) the price of wheat had declined so the contract price was $163,165.72, leaving Gourmet owing Balfour by reason of overpayment in the advance, the sum of $45,375.63. This amount was awarded by the trial court as damages.

At trial the principal issue was whether the contract price had been properly set. As noted, only upon Gourmet's failure to respond to the third margin call did Balfour "price out" the wheat. Mr. Enis testified to his understanding of the contract: He thought he had limited Gourmet's risk in the transaction because there was a floor, or minimum price in the contract; if the Kansas City December futures market declined to $3.55 per bushel, wheat was to be "priced out" at that time. Moreover, Enis expected Balfour to send him margin calls if the futures price on the Kansas City market declined below $3.55 per bushel. This expectation was based on negotiations Enis had with Balfour's agent, Torrence, who admitted that he told Enis that he would be receiving margin calls from the buyer when the price of wheat declined to $5.16 per hundred weight (cwt), or $3.55 per bushel on the Kansas City exchange. Torrence also told Enis that when the price of wheat on the Kansas City December's futures market declined to $5.16 per hundred weight, or $3.55 per bushel, the seller would either have to come forth with more money or have the contract wheat priced out at that time. Enis stated that except on the occasions of the first two margin calls of $9,500 and $4,500, he was unaware of the price of wheat on the Kansas City exchange.

As an aid to the interpretation of the price fixing term, the trial court, over objection, admitted the testimony of expert witness Paul Viscetto on the customs and usages of the grain brokerage industry. Between 1958 and 1976 Mr. Viscetto was a grain buyer and merchandiser for two large west coast grain companies. He testified the *buyer* under this contract was under no obligation to "price out" the subject wheat when the price on the Kansas City December futures market declined to $3.55 per bushel, or $5.16 per hundred weight, and was under no obligation to contact the seller until December 1, 1976. Mr. Viscetto also stated there was no contractual duty on Balfour to send out margin calls when the price of wheat declined to $3.55 per bushel, *but if it did elect to issue margin calls, then Balfour was obligated to price the contract out if the money was not forthcoming from seller Gourmet.* Mr. Viscetto stated under the contract the buyer was under no obligation to keep the seller posted on the price of wheat—although he, personally, would have contacted Gourmet when the price declined to $3.55 per bushel.

The trial court found Balfour was not required at any time before December 1, 1976, if the Kansas City price of wheat fell below $3.55

per bushel, to "price out"—fix—the price at that time; rather the court held the pricing of the wheat could be deferred to a later time and up to December 1, 1976, at the option of Balfour. The court found no affirmative duty on the part of Balfour arising out of its contract to inform Gourmet of the dropping price of wheat on the Kansas City market or to make margin calls or fix the price on the wheat delivered before the date set in this contract, December 1, 1976. The court found Gourmet's losses were sustained by its own failure to keep itself apprised of the price of wheat on the Kansas City exchange; Balfour had acted in good faith and in accord with its contractual rights in setting the contract price (before Dec. 1, 1976) on November 11, 1976, and making its margin call for the $45,375.63 on that date.

DISCUSSION

I

Gourmet urges trial court error in admitting the testimony of expert Paul Viscetto on the subject of custom and usage in the grain brokerage industry in aid of interpreting the contract pricing mechanism; the contract terms were "complete, unambiguous."

This contract is for a sale of wheat, clearly "goods" within the definition of the California Uniform Commercial Code, sections 2105, subdivision (1), and 2107, subdivision (2). It is therefore subject to the provisions of the California Uniform Commercial Code. California Uniform Commercial Code section 2202 provides: "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement *but may be explained or supplemented*

"(a) *By course of dealing or usage of trade* (Section 1205) or by course of performance (Section 2208); and

"(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." (Italics added.) In the California Uniform Commercial Code comment to section 2202, it is stated:

"Under this section the theory of the former California parol evidence rule is altered. See Official Comment 1. Rather than assuming that the parties intended a fully integrated document, section 2202(b) assumes that a written contract does not express the full agreement of the parties unless the court expressly so finds.

"2. Paragraph (a) enlarges the permissible use of trade usage and custom to explain or supplement a written memorandum or agreement. See Code of Civil Procedure § 1870 (12) allowing usage to be put in evidence 'as an instrument of interpretation,' [citations]."

Case authority supports the code comment. In *Heggblade-Marguleas-Tenneco, Inc.* v. *Sunshine Biscuit, Inc.* (1976) 59 Cal.App. 3d 948 [131 Cal.Rptr. 183], contracts for the purchase of potatoes were in issue. Sunshine Biscuit had contracted to purchase 100,000 sacks of potatoes from HMT and HMT undertook to plant the potatoes. By the time the potatoes were grown, Sunshine Biscuit's requirements had declined and it needed only 60,000 sacks. HMT sued for damages. At trial Sunshine Biscuit offered testimony as to the custom and usage of the potato processing industry to the effect that the quantity specified in such contracts were only estimates and that Sunshine Biscuit was not obligated to purchase more than its actual requirements. The court stated: "Appellant contends that the quantity terms in the contracts are definite and unambiguous, hence it was error to admit into evidence the custom of the processing potato industry that the amounts specified are reasonable estimates. Appellant's contention is without merit." (*Id.*, at p. 954.)

The California authority is supported in jurisdictions interpreting provisions similar to the California Uniform Commercial Code. In *Columbia Nitrogen Corporation* v. *Royster Company* (4th Cir. 1971) 451 F.2d 3, the seller sued the buyer for breach of contract for the purchase of a specified quantity of phosphate. The buyer's defense was a trade usage which imposed no duty to accept at the quoted prices the minimum quantity stated in the contract. The trial court had excluded this evidence because "'custom and usage. . . are not admissible to contradict the express, plain, unambiguous language of a valid written contract, which by virtue of its detail negates the proposition that the contract is open to variances in its terms.'" (*Id.*, at p. 8.) The Court of Appeal interpreted Virginia Uniform Commercial Code section 2-202 (identical to California Uniform Commercial Code section 2202, subd. (a)) as

meaning that where the contract does not expressly state that trade usage cannot be used to explain or supplement the written terms, the evidence of trade usage should be admitted to interpret the contract. "The contract is silent about adjusting prices and quantities to reflect a declining market. It neither permits nor prohibits adjustment, and this neutrality provides a fitting occasion for recourse to usage of trade and prior dealing to supplement the contract and explain its terms." (*Id.*, at pp. 9-10.)

And in *Campbell* v. *Hostetter Farms, Inc.* (1977) 251 Pa.Super. 232 [380 A.2d 463], the contracts for the sale of wheat and corn to be delivered at harvest were in issue. The farmer failed to deliver the specified quantity of grain due to abnormal rainfall which reduced the yield of his acreage. The trial court admitted parol evidence to show that the farmer was obligated to provide the required quantity of grain without regard to the source. On appeal, it was argued "that the memoranda of agreements are too clear and unambiguous to permit parol evidence of the intended meaning of the parties; . . ." (*Id.*, at p. 465.) The court rejected that argument, stating (p. 466): "We conclude that it is not a prerequisite to the admissibility of testimony under section 2-202 of the Code that the wording of the contracts be ambiguous. It is to be noted that there is no such requirement in the wording of the statute and this interpretation is reiterated in the official comment on the section by the Commissioners on Uniform State Laws who drafted the legislation."

In *Bd. of Trade of San Francisco* v. *Swiss, etc.* (9th Cir. 1979) 597 F.2d 146, 147, Antex Industries, a California corporation, contracted to sell components for electronic calculators to North American Foreign Trading Corporation through a documentary letter of credit requiring presentation of "full set clean on board bills of lading" as a precondition to payment. The components were in fact shipped by air and an air waybill was presented instead of a bill of lading. The seller's assignee argued that "the phrase in question is unambiguous and permits shipment by air, and that evidence of custom is not admissible to contradict the unambiguous terms of a written contract." (*Id.*, at p. 148.)

Applying California law, the Ninth Circuit Court of Appeals held that evidence of custom and usage had been properly admitted even though the words of the contract were unambiguous. "[T]he California Supreme Court has specifically rejected the theory that some words

have an immutable meaning that must be applied irrespective of the intent of the parties:

" . . . . . . . . . . . . . .

"Further, the code explicitly provides that '[t]erms...which are...set forth in a writing intended by the parties as a final expression of their agreement...may be explained or supplemented...[b]y a course of dealing or usage of trade....'" (*Bd. of Trade of San Francisco* v. *Swiss, etc., supra,* 497 F.2d 146, 148.) (See also to the same effect: *Alaska Ind. Fish. Mkg. Ass'n.* v. *New England Fish Co.* (1976) 15 Wn. App. 154 [548 P.2d 348, 352]; *A & G Const. Co., Inc.* v. *Reid Brothers Logging Co., Inc.* (Alaska 1976) 547 P.2d 1207, 1212; *Chase Manhattan Bank* v. *First Marion Bank* (5th Cir. 1971) 437 F.2d 1040, 1046.)

The foregoing statute, comment and judicial declarations compel this conclusion: California Uniform Commercial Code section 2202, subdivision (a), permits a trade usage to be put in evidence "as an instrument of interpretation" (Cal. U. Com. Code, com. 2, West's Com. Code Ann., p. 154) without the earlier requirement of proof of ambiguity. The trial court properly admitted the expert's evidence of custom and usage to explain and supplement the pricing term of the contract.

## II

Gourmet asserts Balfour breached an implied covenant of good faith in delaying "fixing the contract price" in the falling Kansas City grain market even though the contract, as interpreted, authorized Balfour's nonaction.

Every party to a contract has a duty to act in good faith regarding contractual obligations. (Cal. U. Com. Code, § 1203.) Nevertheless, the duty to act in good faith does not alter the specific obligations of the parties under the contract.

The trial court concluded Gourmet itself could have set the contract price at any time up to December 1, 1976. Balfour could only set the price under specific circumstances and had no duty to set the contract price at all unless Gourmet failed to meet a margin call. Furthermore, the court found under the contract Balfour had no obligation to make margin calls (although it made three) or to keep Gourmet informed of

the price of wheat. Gourmet, despite its right to set the contract price at any time, made no attempt to set the contract price. The court found Gourmet was a knowledgeable agricultural business entity, with experience in fixed-price-later contracts; Gourmet had elected to stay with the falling wheat market during 1976. The court further found any loss to Gourmet was proximately caused by its own failure to keep itself apprised of the fluctuating market.

In contrast, Balfour acted within its contract rights when on November 9, 1976, it sent a margin call requesting the return of $35,000 of the advanced purchase price. When Gourmet failed to return that portion of the advanced purchase price—failed to meet the margin call—by November 12, 1976, Balfour was authorized to "price out" the wheat at that time.

The California Uniform Commercial Code defines good faith in the case of a merchant as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." (§ 2103, subd. (1)(b).) Gourmet offers no facts to support an inference that Balfour acted other than in good faith. Acts in accord with the terms of one's contract cannot without more be equated with bad faith.

Finally it is a fair inference from the evidence before the trial court that Gourmet was gambling on an increase in wheat prices which did not occur. It is clear Balfour had nothing to gain by pricing the contract while the price of wheat was low. Yet it was commercially reasonable for Balfour at some point to demand that Gourmet return that portion of the advanced purchase price which exceeded the current value of the contract. Not only was such conduct within Balfour's contractual rights, but it was also a commercially reasonable course of conduct. The trial court's conclusion that Balfour acted in good faith is supported by substantial evidence.

### III

Gourmet lastly asserts trial court error in awarding certain costs to Balfour.

While Code of Civil Procedure section 1032 provides for the recovery of costs by the prevailing party, this section does not specify what items may be recovered. Thus, the determination of the items al-

lowable as costs is largely within the trial court's discretion. (*Whitney* v. *Whitney* (1958) 164 Cal.App.2d 577, 585 [330 P.2d 947]; *Von Goerlitz* v. *Turner* (1944) 65 Cal.App.2d 425, 432 [150 P.2d 278]; *Puppo* v. *Larosa* (1924) 194 Cal. 717, 721-723 [230 P. 439].) The witness fees and mileage awarded here were in accordance with the amount specified in Government Code section 68093. The cost of copying, postage and delivery were granted by the trial court as covering the expense of service under Code of Civil Procedure section 1032, subdivision (b).

Code of Civil Procedure section 998, subdivision (d), provides that where an offer to compromise made by a plaintiff is rejected by a defendant who fails to obtain a more favorable judgment, the court may award the plaintiff the costs of the services of its expert witnesses. Balfour was awarded additional costs pursuant to this section.

In *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 315 [136 Cal.Rptr. 603], the court stated: "The trial court has discretion under Code of Civil Procedure section 998 to allow a prevailing party . . . a reasonable sum to cover the costs of the services of expert witnesses. [Citation.] The trial court was in a far better position . . . to exercise this discretion and determine what was a reasonable amount and what was reasonably necessary." (See also *Pomeroy* v. *Zion* (1971) 19 Cal.App.3d 473 [96 Cal.Rptr. 822].)

The enlarging of a copy of the contract—used by the expert in testifying—and his hotel room expenses were properly awarded under Code of Civil Procedure section 998.

Gourmet does not include the transcript of the hearing on costs in the record on appeal, yet asks this court to find an abuse of discretion on the part of the trial court. In such void, it is difficult if not impossible for this court to evaluate the factors involved in the trial court's exercise of discretion.

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 17, 1980. Bird, C. J., was of the opinion that the petition should be granted.