**Paul David ROTH, an individual,**
**Plaintiff,**

**v.**

**MADISON NATIONAL LIFE INSURANCE COMPANY, a Wisconsin corporation; and Does 1 through 30, inclusive, Defendants.**

No. CV 09–3363 GAF (FFMx).

United States District Court,
C.D. California.

May 26, 2010.

Gary L. Tysch, Law Offices of Gary L. Tysch, Encino, CA, for Plaintiff.

Karen D.M. Denvir, Martin E. Rosen, Barger and Wolen LLP, Los Angeles, CA, for Defendants.

**REVISED AND AMENDED MEMO-RANDUM & ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

GARY ALLEN FEESS, District Judge.

## I.

### INTRODUCTION

This insurance dispute arises out of two life insurance policies Plaintiff Paul David Roth purchased from Defendant Madison National Life Insurance Company ("Madison"). Both of the operative life insurance policies contain a "Critical Illness Benefit Rider" (the "Riders"), which provides that 10% of the policies' death benefits would be advanced in the event the insured undergoes an angioplasty procedure so long as certain conditions were met before the procedure was performed. The condition relevant to this dispute is the requirement that the angioplasty be performed after Roth's physician received evidence that Roth's EKG showed significant electrographic changes.

In July 2004, Roth, whose EKG showed no such changes, underwent an angioplasty and subsequently submitted a claim for benefits under the Riders. However, finding that the underlying conditions of the Riders had not been satisfied, Madison denied Roth's claim. After Roth contested Madison's denial, Madison submitted Roth's medical records for review by an independent medical services review organization. Because the medical record plainly showed that Roth suffered no significant EKG changes prior to his July 2004 angioplasty, Madison affirmed its denial of Roth's claim.

Roth then sued Madison for breach of contract and insurance bad faith. In this lawsuit, Roth concedes he did not provide Madison with evidence of significant EKG changes as expressly required by the Riders, but asserts that the terms of the Riders should be disregarded because both his cardiologist and Madison's independent physician concluded that the angioplasty was medically necessary. Although Madison disagrees with Roth's contention, it has paid the 10% benefit and now moves for summary adjudication of the bad faith claim. Madison contends that, as a matter of law, it cannot have engaged in insurance bad faith by denying a claim based on the unequivocal language of the Riders. For reasons discussed in greater detail below, the Court agrees that an insurer who insists on compliance with the express, unambiguous terms of its life insurance policies cannot be held liable for insurance bad faith. Madison's motion for partial summary judgment is therefore **GRANTED.**

## II.

### BACKGROUND

#### A. ROTH'S LIFE INSURANCE POLICIES

Standard Life Insurance Company ("Standard Life") issued Roth life insurance policy number 0232000536 and life insurance policy number 0232004118, which became effective June 1, 1999, and February 20, 2001, respectively. (Statement of Undisputed Facts ("SUF") ¶¶ 1–2.) Both policies provide a death benefit of $100,000. (*Id.* ¶ 3.) In addition, *each* policy contains a "Critical Illness Benefit Rider," which provides a benefit in the amount of 10% of the policy's death benefit, or $10,000, in the event: (1) certain conditions are met; and (2) the insured undergoes angioplasty. (*Id.*) Each Rider states:

> **Angioplasty:** The undergoing of angioplasty, endarterectomy or laser treatment for coronary artery disease, which cannot be adequately controlled by medical therapy, following an unequivocal recommendation by a consultant cardiologist other than the Insured or a mem-

ber of his or her immediate family. The amount of the Critical Illness Benefit payable for this covered condition will be limited to 10% of the base policy Death Benefit immediately prior to the date of surgery.

Any claim for the Benefit must be supported by the following:

(1) A report from the attending qualified cardiologist to include evidence of prior treatment on appropriate medication;

(2) Evidence of significant electrocardiographic (EKG) changes (e.g. ST depression of two (2) millimeters or more); and

(3) Angiographic evidence of the underlying disease must be provided.

(Elkins Decl., Exs. F, G (emphasis added).)

On September 1, 2006, Madison acquired both of Roth's life insurance policies from Standard Life. (Elkins Decl. ¶ 5.)

### B. ROTH'S CLAIM FOR BENEFITS

On July 27, 2004, Roth underwent an angiogram at Brotman Medical Center.[1] (Elkins Decl., Ex. M.) The results of the coronary angiography showed a "90% stenosis in the proximal left anterior descending." (Elkins Decl., Ex. M.) Based on the results of the angiogram, Roth received an angioplasty on the same day. (SUF ¶ 9.)

On January 15, 2007, Roth completed a "Claimant's Statement for Critical Illness Benefits," indicating that on July 27, 2004, he had undergone an angioplasty at Brotman Memorial Hospital.[2] (Id. ¶ 5; Elkins Decl., Ex. H.) As required by the Rider, Roth's cardiologist, Dr. Suhail Dohad, completed a "Confidential Physician's Report for Critical Illness." (SUF ¶ 6.) The report noted that Roth was first diagnosed with coronary artery disease in May 2004. (Elkins Decl., Ex. I.)

### C. MADISON'S DENIAL OF BENEFITS

During its evaluation of Roth's claim for critical illness benefits pursuant to the Riders, Madison requested Roth's medical records from Dr. Dohad and Brotman Medical Center. (Elkins Decl. ¶ 9.) Among these records were Dr. Dohad's notes, which indicated that he had performed a cardiac examination of Roth on July 20, 2004. (Id. ¶ 7.) Dr. Dohad's notes state: "Cardiac exam reveals a regular rhythm."[3] (Id.) The results of the EKG performed were normal. (Id. ¶ 8.)

By letter dated March 21, 2008, Madison denied Roth's claim for angioplasty benefits because, among other things, the July 20, 2004 EKG report submitted prior to Roth's angioplasty did not show any significant EKG changes. (SUF ¶ 10; Elkins Decl., Ex. N.) To date, Roth has not provided Madison with any evidence of significant EKG changes.[4] (SUF ¶ 15.)

1. The report also indicated that Roth "is a 57–year–old gentleman who presents with increasing angina pectoris." (Id.)

2. In the statement, Roth described his critical illness as "chest pain that resulted in a stent." (Elkins Decl., Ex. H.)

3. The report also indicates that Roth possessed symptoms of chest pain, which included exertional chest pain while playing tennis or while walking and fatigue. (See Elkins Decl., Ex. K.) In the section of the report marked "Impressions," Dr. Dohad noted Roth had several risk factors for coronary heart disease. (Id.)

4. The Joint Scheduling Conference Report pursuant to Federal Rule of Civil Procedure 26(f) states: "Roth concedes that he did not provide Madison with evidence of significant EKG changes." That is, Roth agrees that EKG testing was performed, but was normal, despite alleged later definitive angiographic evidence of a 90% or greater occlusion of Roth's coronary artery consistent with a "widow-maker lesion." (Docket No. 7.)

In a letter dated April 2, 2008 to Madison's Chief Executive Officer Diane Shower, Roth requested that Madison reconsider its denial of Roth's claim.[5] (*See* Elkins Decl., Ex. P.) As part of its reconsideration, on June 16, 2008, Madison submitted Roth's claim and medical records to an independent medical services review organization. (SUF ¶ 12.) Dr. Richard Brody, the independent physician who reviewed Roth's medical records, prepared an "Independent Medical File Review." (Elkins Decl., Ex. R.) Dr. Brody noted that Dr. Dohad indeed made an unequivocal recommendation for an angioplasty. (*Id.*) The report also stated the following: "What significant EKG changes do you note prior to the July 27, 2004 angioplasty? *Answer:* None." (*Id.*) In light of Dr. Brody's report, Madison affirmed its denial of Roth's claim for an advance of benefits in a letter dated September 9, 2008. (SUF ¶ 14; Elkins Decl., Ex. S.)

After this lawsuit was filed, Madison paid Roth $20,000 pursuant to the policies' Riders. (Opp. at 15.)

## III.

## DISCUSSION

### A. LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Thus, when addressing a motion for summary judgment, the Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See id.* at 256, 106 S.Ct. 2505. Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. APPLICATION

■ Under California law, "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Kransco v. Am. Empire Surplus Lines Ins. Co.,* 23 Cal.4th 390, 97 Cal.Rptr.2d 151, 2 P.3d 1, 8 (2000) (citing *Comunale v. Traders & Gen. Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198, 200 (1958)). However, "the implied covenant will only be recognized to further the contract's purpose; it will not be read into a contract to prohibit a party from doing that which

---

**5.** On May 15, 2008, Dr. Dohad wrote a letter to Madison in support of Roth's claim. (Elkins Decl., Ex. O.) Dr. Dohad informed Kathryn Elkins, the Supervisor of the Policyowner Service Department for Madison, that because Roth had a "critical (90%) occlusion of his proximal left anterior descending coronary artery consistent with a widow-maker lesion" and a "non-critical stenosis of a marginal branch of the left circumflex coronary artery," he was triaged and successfully underwent a *stent placement in his proximal left anterior descending artery.* (*Id.*) Dr. Dohad noted that his recommendations for angioplasty were "unequivocal." (*Id.*)

is expressly permitted by the agreement itself." *Wolf v. Walt Disney Pictures & Television,* 162 Cal.App.4th 1107, 76 Cal. Rptr.3d 585, 597 (2008) (citing *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 6 Cal.Rptr.2d 467, 826 P.2d 710, 728 (1992)).

■ "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 394 (1988). Thus, the "implied covenant of good faith and fair dealing cannot contradict the express terms of a contract." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.,* 100 Cal. App.4th 44, 122 Cal.Rptr.2d 267, 277 (2002) (citing *Carma Developers,* 6 Cal.Rptr.2d 467, 826 P.2d at 728.)

In *Carma Developers,* a commercial lease expressly provided the lessor with the right to terminate the lease upon receiving notice of the tenant's intent to sublet. 6 Cal.Rptr.2d 467, 826 P.2d at 713. The lessee decided to relocate its headquarters, and submitted a notice of intent to sublet approximately 80 percent of the premises. *Id.* The lessor responded with a notice of termination and pursued a new lease agreement with the intended subtenant. *Id.* The original lessee sued the lessor for, among other things, breach of the implied covenant of good faith and fair dealing. *Id.* The California Supreme Court held that because the lessor's termination of the lease was expressly permitted by the lease and within the parties' reasonable expectations, such conduct could not violate an implied covenant of good faith and fair dealing as a matter of law. *Id.* at 728, 6 Cal.Rptr.2d 467, 826 P.2d 710. The California Supreme Court offered the following reasoning:

We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms.

*Id.* (citations omitted).

As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.

*Id.* (quoting *VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773, 778 (S.D.N.Y. 1969)); *Solomon v. N. Am. Life and Cas. Ins. Co.,* 151 F.3d 1132, 1137 (9th Cir.1998) ("parties can contract explicitly to engage in activities that might otherwise be forbidden by the implied covenant of good faith").

■ Under the terms of the Riders, Roth was required to support his claims for benefits by providing "[e]vidence of significant electrocardiographic (EKG) changes (e.g., ST depression of two (2) millimeters or more)." (Elkins Decl., Exs. F, G.) Because the procedure was performed without benefit of any such evidence, Madison acted within its rights under the express terms of the policies to deny Roth's claim. *See Storek,* 122 Cal. Rptr.2d at 281 ("No obligation to act in good faith can be implied to contradict or limit that express condition precedent.") While Roth may argue that he should not be required to satisfy the conditions precedent, he cannot deny that he failed to satisfy one of the conditions expressly stated in each Rider.

Roth's exaggerated, disparaging arguments regarding the absurdity and unen-

forceability of the conditions precedent miss the mark.[6] Even if this Court accepted those arguments and found, as a matter of first impression, that the Rider's terms are unenforceable, the Court would be writing on a clean slate as neither the Court nor the parties have found precedent construing the term at issue. In the absence of settled precedent, California case law suggests that Madison's decision to abide strictly by the express terms of the contract cannot give rise to liability for bad faith. *Morris v. Paul Revere Life Ins. Co.*, 109 Cal.App.4th 966, 135 Cal.Rptr.2d 718, 720, 726 (2003).[7] "Acts in accord with the terms of one's contract cannot without more be equated with bad faith." *Balfour, Guthrie & Co., Ltd. v. Gourmet Farms*, 108 Cal.App.3d 181, 166 Cal.Rptr. 422, 428 (1980). "[T]he duty to act in good faith

does not alter the specific obligations of the parties under the contract." *Id.* at 427, 108 Cal.App.3d 181. Where it is undisputed that Madison's conduct was in accordance with the express terms of the Riders, there can be no basis for a bad faith claim as a matter of law.

■■■ Therefore, Madison's motion for partial summary judgment is **GRANTED**.[8]

## C. ROTH'S CONTENTIONS

In his opposition, Roth essentially ignores controlling case law suggesting that Madison's adherence to the express requirements of the insurance contract preclude recovery under a bad faith claim. Instead, Roth contends that the clause and the accompanying Riders are unenforceable. These arguments lack merit.

---

**6.** (*See* Opp. at 9 ("If Madison National had its way, every exclusion, no matter how absurd, would be enforceable as long as the insurer unilaterally included the provision somewhere within the four corners of its insurance contract. Further, the act of inserting an obviously illegal, unreasonable or nonsensical exclusion into the policy could never give rise to bad faith, simply because it was contained within the policy.").)

**7.** In *Morris*, Plaintiff alleged that Revere acted in bad faith in denying his claim for benefits under his disability policy. The court addressed the sole issue of whether Revere's position was objectively reasonable in light of the law that existed prior to the decision in *Galanty v. Paul Revere Life Ins. Co.*, 23 Cal.4th 368, 97 Cal.Rptr.2d 67, 1 P.3d 658 (2000). In affirming summary judgment in favor of Revere, the *Morris* court found that Revere's position was reasonable in light of unsettled legal precedent prior to *Galanty*, and therefore could not give rise to a bad faith claim. *Morris*, 135 Cal.Rptr.2d at 726. Finding that Revere did not have the benefit of *Galanty's* clarity, the *Morris* court noted: "It would be unfair to conclude, implicitly, that Revere should have seen it coming." *Id.* Similarly, even assuming that the Riders' conditions have been rendered obsolete by advances in medical treatment, to hold Madison liable for

bad faith would be patently unfair. In this case, Madison's position was not unreasonable in light of the clear language of its policies.

**8.** In California, "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 271 Cal.Rptr. 246, 255 (1990). "The mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 31 Cal.Rptr.2d 433, 440 (1994) (citing *Opsal v. United Servs. Auto. Ass'n*, 2 Cal.App.4th 1197, 10 Cal.Rptr.2d 352, 357 (1991)). Moreover, "where there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of the dispute." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal.App.4th 335, 108 Cal. Rptr.2d 776, 784 (2001).

### 1. REGULATORY APPROVAL

Roth first argues, without presenting any supporting evidence, that the exclusionary language contained in Madison's policies did not receive approval by the California Insurance Commissioner. (Opp. at 11.) By its own terms, Roth's contention finds support only in his imagination: "It is difficult to imagine that the State of California would have approved language excluding the angioplasty benefit in the absence of an abnormal EKG." (*Id.*) Roth offers no evidence to establish whether or not the Insurance Commissioner has ever been asked to approve the specific language at issue in this case, or any similar language. Without such evidence, Roth has failed to establish a genuine issue of fact for trial on the question. But the argument is further flawed because Roth fails to explain how regulatory silence on the critical issue before this Court supports, let alone establishes, his claim that Madison's reliance on the provision breached the covenant of good faith and fair dealing.

■ Roth also argues that the Riders' language requiring evidence of an abnormal EKG fails to conform with California regulations. Roth cites to Section 2220.8 of Title 10 of the California Administrative Code, which states: "A benefit shall be deemed not sufficient to be of real economic value to the insured if it is subject to exceptions, limitations or reductions concerning any subject matter other than the following...." 10 CAL. ADMIN. CODE § 2220.8(a). Although the regulation lists certain exclusions and limitations to this general rule, Roth argues that none of them is applicable in this case. However, the title of Section 2220.8 expressly links its limitations to Insurance Code Section 10291.5, which deals with disability insurance policies, not life insurance. *Id.; see* CAL. INS.CODE § 10291.5. Disability insurance deals specifically with insurance relat-

ing to disablements resulting from sickness, *id.* § 106(a), and almost universally provides an alternate source of income when an insured is precluded, due to the disablement, from performing his or her job duties. Here, Roth's policy is a life policy that contains a term accelerating his right to collect a portion of the life benefit prior to death under specified conditions, one of which is the performance of an angioplasty based on specifically identified medical evidence. The conditions for coverage are not contingent on, or related to, a disability or a total disability. Because the Court concludes that the Riders do not qualify as disability insurance, Roth's citation to the Administrative Code provides no support for his contention that Madison has acted in bad faith.

### 2. AMBIGUITY

■ Roth also argues that the language of the Riders is ambiguous and suggests that a plain reading of the three subsections shows that "any one of them would be sufficient to satisfy the medical necessity of an angioplasty, and unquestionably two of them were met." (*Id.*) It is an undisputed fact that the Riders provide that any claim for the Critical Illness Benefit must be supported by the following:

(1) A report from the attending qualified cardiologist to include evidence of prior treatment on appropriate medication;

(2) Evidence of significant electrocardiographic (EKG) changes (e.g. ST depression of two (2) millimeters or more); and

(3) Angiographic evidence of the underlying disease must be provided.

(Elkins Decl., Exs. F, G.)

The text demonstrates that these requirements are not at all ambiguous. Rather, Roth really claims that the Court should construe the language to eliminate

the requirement that all three conditions be met because the need for an angioplasty might be shown with less medical evidence. He contends that complying with the terms of the Riders to the letter was unnecessary due to his medical necessity and the recommendation of the doctor. In other words, the Court should disregard the language of the agreement and essentially re-write the parties' agreement to salvage Roth's bad faith claim.[9] For that proposition, he cites no authority, and has therefore sought, erroneously, to characterize the language as requiring interpretation because of its ambiguity.[10] This discussion demonstrates that the argument has no merit. But, again, even if the Court were to ultimately accept that argument regarding Roth's entitlement to benefits, the argument falls short of establishing a basis for a bad faith claim.

■ As a last gasp, Roth argues "[i]t would be unconscionable for the non-medical staff of an insurer to dictate the medical protocol justifying an angioplasty." (Opp. at 12.) Roth's argument misses the mark entirely because this dispute does not involve a health insurance plan, and imposes no obligation on any medical provider. The Riders require neither doctors nor medical professionals to follow certain procedures in the administration of care. Nor do they dictate how medical professionals should properly perform their duties. Thus, benefits under the Riders do not turn on whether EKG findings are material to a particular cardiologist's assessment of the need for angioplasty. The Riders simply indicate the circumstances under which the insured is entitled to an acceleration of a portion of his life insurance benefit. In these circumstances, it is hardly surprising that Roth has presented neither factual nor legal support for his unconscionability argument, which this Court rejects.

### 3. CLEAR AND CONSPICUOUS

■ Under California law, any provision that "takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain, and clear.'" *Haynes v. Farmers Ins. Exch.*, 32 Cal.4th 1198, 13 Cal.Rptr.3d 68, 89 P.3d 381, 385 (2004) (citing *Steven v. Fidelity Cas. Co.*, 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284, 294 (1963)). Without any legal analysis whatsoever, Roth cites a number of California cases that uphold the principle that contractual exclusions in the insurance context must be clear and conspicuous. (Opp. at 12–14.)

The unusual nature of the contract term in issue suggests that this argument has no persuasive power whatsoever. The somewhat idiosyncratic provision is not an exclusion at all, but rather an expansion of the usual life insurance benefit that allows Roth to recover a percentage of the life payout without actually dying. The Riders therefore do not take away; rather, they give more coverage than the typical life policy.[11] That certain conditions must be

---

**9.** However, to read "must" as merely advisory language, as Roth's counsel suggests, is contrary to basic principles of contract interpretation. *See Jones v. Catholic Healthcare West*, 147 Cal.App.4th 300, 54 Cal.Rptr.3d 148, 152 (2007) ("Courts routinely construe ... words like 'shall' or 'must' as *mandatory.*") (emphasis added).

**10.** Roth's counsel contends that the Riders were drafted in a way to deliberately exclude persons like Roth from obtaining the addi-

tional benefit. This is an argument for which there is no evidentiary support and fails to create a genuine issue of material fact.

**11.** At the hearing, Roth's counsel characterized Roth's angioplasty as a health benefit that remains "covered" by the operative Riders. However, viewing the present case as a dispute regarding coverage is inaccurate. In the circumstances of this case, the angioplasty is merely an *event* which gives rise to a benefit if certain conditions are met.

met before the right to recover that benefit arises in no way defeats the reasonable expectations of the policy holder. But even if the Court were to apply the "clear and conspicuous" rule, Roth provides no evidence or any persuasive argument in support of the claim that the policy language is not conspicuous, plain, or clear. In fact, Roth's argument that the requirements should be ignored based on his medical necessity indicates that the requirements of the contract are, in fact, clear and unambiguous, but inconsistent with his desire to pursue this claim.

For these reasons, the Court rejects the contention that the Riders constitute exclusions, and further concludes that even if they were, they meet the clear and conspicuous requirement.

### 4. DAMAGES

A substantial portion of the opposition is dedicated to Roth's ability to recover various forms of damages due to Madison's conduct. However, at issue in Madison's motion is not whether Roth can or cannot recover punitive damages; the issue is whether Madison can be held liable for insurance bad faith for abiding by the express terms of the relevant policies. Roth's recitation of the law on damages in the insurance context is inapposite to the present motion.

### IV.

### CONCLUSION

For the foregoing reasons, Madison's motion for partial summary judgment is **GRANTED.**

**IT IS SO ORDERED.**